[S. F. No. 10411. In Bank.—March 13, 1923.]

M. F. TARPEY et al., Petitioners, v. W. F. McCLURE, as State Engineer of the State of California, et al., Respondents.

[1] CALIFORNIA WATER STORAGE DISTRICT ACT — TITLE — SUBJECTS — CONSTITUTIONALITY OF.—The California Water Storage District Act (Stats. 1921, p. 1727) does not violate the provisions of section 24, article IV, of the constitution in embracing more than one subject.

[2] ID.—REPEAL OF ACT OF 1915.—The provision of said act for the repeal of the act of 1915 and the acts amendatory thereof is not foreign to the subject matter of the former act, and does not constitute a different subject as the history of the legislation shows that the present act had its origin in the act of 1915 and the repeal of the latter is merely a natural and proper incident to the present enactment.

[3] ID.—TITLE—SUBJECTS EMBRACED IN ACT.—The California Water Storage District Act cannot fairly be said to embrace any subject not expressed in its title, with the possible exception of the provisions for dissolution contained in section 65, the failure of which section would in no way affect the remaining provisions of the act.

[4] ID.—LOCAL AND SPECIAL PROVISIONS—INITIATION OF PROCEEDINGS.—Said act cannot be said to be local and special in that it provides for the initiation of proceedings, either by petition signed by the holders of a majority in value of the lands within the proposed district, or by not less than five hundred land owners representing not less than ten per cent in value of the land; neither can it be said that this provision violates section 21 of article I of the constitution, in that it grants to one class of citizens privileges or immunities which upon the same terms are not granted to all, or that it violates the fourteenth amendment to the federal constitution, in that it denies to certain persons equal protection of the law.

[5] ID.—CONSTRUCTION OF ACT.—The contention that, in the provision of said act that the district "may include the major portion of the land constituted within two or more of the district agencies of the state," the word "may" should be construed to mean "must," cannot be maintained.

[6] ID.—SPECIAL LEGISLATION.—It cannot be held that said act is special because there is another act in effect which covers the same field of legislation, nor because it provides that an affidavit shall be sufficient evidence of the genuineness of signatures to the petition.

[7] ID. — CREATION OF DISTRICT — LEGISLATIVE ACT — DELEGATION OF POWER.—The creation of a water storage district is a legislative act, the purpose of which may not be delegated by the legislature to an executive or judicial officer.

[8] ID.—CONDITIONS FOR ORGANIZATION—DETERMINATION OF FACT.—The legislature may enact conditions, upon the performance of which a water storage district shall be regarded as organized with the powers mentioned and described in the act; and it may intrust the doing of the act or the determination of the fact, upon which those conditions depend, to some other agency.

[9] ID.—POWER OF LEGISLATURE—CONFERRING DISCRETION ON ADMINISTRATIVE OFFICER.—The legislature may, without violating any rule or principle of the constitution, confer upon an administrative officer a large measure of discretion, provided the exercise thereof is controlled and guided by rules prescribed therefor.

[10] ID.—DELEGATION OF POWER.—The provision in section 1 of said act authorizing the state engineer to employ such engineers, attorneys, and other assistants as he may deem necessary, and to fix their compensation, does not contravene section 1 of article

IV of the constitution, as they are not officers but mere employees and the discretion as to the number to be employed is not unguided.

[11] ID. — FEASIBILITY OF PROJECT — DETERMINATION OF ENGINEER.— The provision of section 5 of said act that the engineer "shall ascertain and determine the practicability, feasibility and utility of the proposed project" is not an attempted delegation of legislative or judicial power.

[12] ID. — COST OF EMPLOYEES — LEVY OF TAXES — DELEGATION OF LEGISLATIVE POWER—VOID PROVISION.—The provision of said act that the engineer may employ all necessary engineers, attorneys and assistants and that the cost thereof shall be deemed a part of the expense of said project, and that he "may require the same to be paid by the proponents of said district, or he may issue warrants therefor," to pay which the directors are required to levy an assessment, amounts to such a delegation of legislative power as is prohibited by the constitution and is void, but this does not render the act unworkable, because the engineer may require the necessary cost of investigations to be paid by the proponents of the project.

[13] ID. — ESTABLISHING BOUNDARIES OF DISTRICT — POWER OF ENGINEER.—Section 6 of said act does not vest in the engineer the arbitrary power to make such changes in the boundaries of the proposed district, or in the location and character of the proposed works therein, as he may see fit, which power would be unlawful.

[14] ID. —DIVISIONS OF DISTRICT.—The provisions of said act for the division of the district into five to eleven divisions, "possessing the same general character of water rights or interests," and for the establishment of "a convenient number" of election precincts, does not confer arbitrary authority, but a controlled and guided discretion depending upon the facts ascertained.

[15] ID.—LEVYING OF ASSESSMENTS—DUE PROCESS.—The contention that the provisions of section 16 of said act, for the levy of assessments at a flat rate per acre upon all the lands of the district to defray the general expenses of the district, prior to any hearings on the question of benefits, require the taking of private property without due process of law, cannot be maintained.

[16] ID. — DETERMINATION OF BENEFITS — TIME—RULE. — The general rule on said subject is that a hearing as to benefits must be provided at some time before the land is finally burdened by the assessment, but this rule is subject to the exception that when the legislature itself determines the boundaries of the district, either by describing them or by laying down a fixed rule by which they may be determined, the property owners affected are not entitled to a hearing, for they are conclusively presumed to have been heard through their representatives in the legislature.

[17] Id.—Levying Assessments—Hearing as to Benefits—Modifi-cation of Assessments.—As to the provisions of section 19 of said act, for the levy of what may be called the main assessment, the contentions cannot be maintained that the act does not pro-vide for a hearing as to benefits and does not specify the rules by which the board is to proceed in modifying or amending the· assessment. It is not necessary that the notice of hearing shall expressly state that the assessment-roll has been filed in the office of the state engineer. The law requires that it must be so filed before the notice is given.

[18] Id.—Increased Assessment—Notice.—The failure of said act to specify the length of notice which must be given the property owners of the proposed increased assessment is not fatal.

[19] Id.—Sale of Water and Hydro-electric Power.—Said act does not contemplate the sale of water or hydro-electric power to others than the inhabitants of the district, to whose uses it is dedicated (except as to a possible surplus thereof), and it does not appear, therefore, to provide for a taking of private prop-erty for a private use.

[20] Id.—Issuance of Warrants—Power of Engineer.—Said act is not violative of sections 12 or 13 of article XI of the constitu-tion, because the attempt to confer upon the engineer the power to issue warrants which should automatically result in the levy of assessments is nugatory. The adjustment board is given no power under the act to levy assessments, but merely to apportion them.

[21] Id.—Elections—Right to Vote.—Said act does not violate sec-tion 24 of article I, or section 1 of article II, of the constitution, in that it denies to any but land owners the right to vote at dis-trict elections.

[22] Id.—Judicial Powers—State Engineer—Adjustment Board.— The claims that said act confers judicial power upon the state engineer, that in the adjustment board it has attempted to create a court, and that this board is called upon to exercise judicial powers, cannot be sustained.

[23] Id. — Constitutionality of Act. — Said act is not unconstitu-tional in any of the provisions essential to its practical operation.

[24] Id. — State Engineer — Department of Public Works. — The words "state engineer," wherever they appear in the Water Storage Act, should be held to refer to the "Department of Public Works and the appropriate officers thereof."

PROCEEDING in Mandamus to compel the respondents to receive and act upon a petition for the organization of a water storage district. Granted.

T. T. C. Gregory, Edward T. Houghton, Max ˙ Thelen, James S. Bennett, A. E. Chandler, M. B. Harris, Harris &

Hayhurst, H. Scott Jacobs, Guy Knupp, Lindsay & Conley, Powers & McFadzean, Sidney J. W. Sharp, Jesse H. Steinhart, Warren Olney, Jr., Milton T. Farmer, A. L. Cowell and Edward F. Treadwell for Petitioners.

S. E. Burroughs and C. C. Carleton for Respondents.

Barclay McCowan and Haas & Dunnigan, *Amici Curiae.*

MYERS, J.—This is a proceeding in *mandamus* to compel the respondents to receive and act upon a petition for the organization of a water storage district under the California Water Storage District Act (Stats. 1921, p. 1727). It is submitted upon demurrer, the effect of which is to challenge the constitutionality of the act.

[1] It is urged that the act violates the provisions of section 24, article IV, of the constitution, in that it embraces more than one subject. It would be impracticable to attempt here to set forth even an outline of its comprehensive provisions. It must suffice to say that it provides for the organization, operation, maintenance, and government of water storage districts; for the acquisition by various means, and the storage, conservation, and distribution of water for irrigation, and for drainage and reclamation connected therewith; and for the generation and disposition of hydro-electric energy developed incidental thereto. It also provides for the repeal of the California Irrigation Act of 1915 and all acts amendatory thereof. The conservation of water by means of flood control works to restrain flood waters which otherwise would overflow the land and go to waste, and, incident thereto, the reclaiming of the lands which otherwise would be overflowed and rendered useless, the storage and distribution of such water for purposes of irrigation, and, incident thereto, the generation and use of hydro-electric energy as a by-product of such storage and distribution, all seem to us to be so legitimately and intimately connected one with another as not to constitute different subjects within the purview of the constitution. It may be said that in these respects the act has but a single object, to wit, the better control and utilization of water, or, stated differently, the reclamation and use of waste water, and, incident thereto, the reclamation and use of waste land.

[2] A somewhat different question is presented by the provision for the repeal of the act of 1915 and the acts amendatory thereof. It is suggested that while these two acts occupy, in general, the same field of legislation, neither of them need be an exclusive occupant thereof and there is no reason why they should not both subsist, side by side; and that, therefore, the provision for the repeal of the former is foreign to the subject matter of the latter, and constitutes a different subject. However, it fairly appears from the history of the legislation that the present act had its origin in the act of 1915 (Stats. 1915, p. 1173), which was amplified by the statute of 1917 (Stats. 1917, p. 1068), substantially re-enacted in 1919 (Stats. 1919, p. 671), its re-enactment being held unconstitutional in *Mordecai* v. *Board of Supervisors,* 183 Cal. 434 [192 Pac. 40], and finally enacted in its present form in 1921. So regarded, it is apparent that the repeal of the former acts is merely a natural and proper incident to the present enactment.

[3] We do not think the act can fairly be said to embrace any subject not expressed in its title, with the possible exception of the provisions for dissolution contained in section 65 (the provisions of section 68 being concededly nugatory). Section 18 does not provide for the dissolution of a district, but rather specifies the conditions under which the organization of a proposed district may fail of completion. Section 65 does purport to provide the method by which such a district may be dissolved, and does, therefore, deal with a subject not embraced in the title, unless, as suggested, that subject may be said to be comprehended within the term "maintenance." It is not necessary to decide this question because the failure of section 65 would, in no way, affect the remaining provisions of the act. The remaining "subjects" specified as not expressed in the title are not additional subjects but mere incidents to those which are expressed. The act does not attempt to create new state officers. The executive directors therein provided for are employees, not officers. Of course, the title does not state all of the details found in the body of the act. To do so would involve restating the entire act in the title.

[4] The act cannot be said to be local and special in that it provides for the initiation of proceedings, either by a petition signed by the holders of a majority in value of the

lands within the proposed district or by not less than five hundred land owners representing not less than ten per cent in value of the land. It is obvious that in a very large district it would be impracticable to secure the signatures of a majority of the land owners, and that in a very small district the signatures of ten per cent of the owners might not be regarded as sufficient evidence of the merits of the proposal. The line had to be drawn somewhere between these two differing conditions, and it cannot be justly said that the legislature acted "arbitrarily" in placing it where it did. Neither can it be said that this provision violates section 21 of article I, in that it grants to one class of citizens privileges or immunities which upon the same terms are not granted to all, or that it violates the fourteenth amendment to the federal constitution, in that it denies to certain persons equal protection of the law. This court cannot say, nor could the legislature determine in advance, that it will require either greater or less effort to procure the signatures of a majority in one sort of district than it will to obtain the signatures of ten per cent in the other sort.

[5] In view of the legislative history of this act, there is no merit in the claim that in the provision that the district "may include the major portion of the lands situated within two or more district agencies of the state," the word "may" should be construed to mean "must."

If the provision in section 6, making the finding of the state engineer in certain matters conclusive against all persons except the state, should be held unconstitutional, it would in no way destroy or render useless the remainder of the act. [6] There is no merit in the point that this act is special because there is another act in effect which covers the same field of legislation. (*Los Angeles* v. *Leavis*, 119 Cal. 164 [51 Pac. 34].) Neither can it be said to be special because it provides that an affidavit shall be sufficient evidence of the genuineness of signatures to the petition. There are many provisions in the general laws and in the codes · making affidavits competent evidence for specified purposes.

We come now to a more serious and difficult group of questions, presented by the claim that the act attempts to delegate legislative power to the state engineer in violation

of section 1 of article IV of the constitution, and that it requires him to exercise both legislative and judicial powers in violation of article III thereof.   **[7]**   Unquestionably, the creation of such a district is a legislative act, the performance of which may not be delegated by the legislature to an executive or judicial officer.   (*People* v. *Parks,* 58 Cal. 624; *Tulare Water Co.* v. *State Water Com.,* 187 Cal. 533 [202 Pac. 874]; *Matter of Peppers,* 189 Cal. 682 [209 Pac. 896].)   **[8]**   On the other hand, it is equally well settled that the legislature may enact conditions, upon the performance of which the district shall be regarded as organized with the powers mentioned and described in the act; and it may intrust the doing of an act or the determination of a fact, upon which those conditions depend, to some other agency.   (*Inglin* v. *Hoppin,* 156 Cal. 483 [105 Pac. 582]; *Fallbrook Irr. Dist.* v. *Bradley,* 164 U. S. 112 [41 L. Ed. 369, 17 Sup. Ct. Rep. 56, see, also, Rose's U. S. Notes]; *Field* v. *Clark,* 143 U. S. 649 [36 L. Ed. 294, 12 Sup. Ct. Rep. 495]; *In re Madera Irr. Dist.,* 92 Cal. 296 [27 Am. St. Rep. 106, 14 L. R. A. 755, 28 Pac. 272].)   If, as claimed by respondents, this act attempts to vest in them arbitrary power and authority, or an uncontrolled and unguided discretion, in matters essential to the creation of the proposed district, it is, to that extent, void (*People* v. *Parks, supra; Tulare Water Co.* v. *State Water Com., supra; Riley* v. *Chambers,* 181 Cal. 589, 595 [8 A. L. R. 418, 185 Pac. 855]).   **[9]**   On the other hand, the legislature may, without violating any rule or principle of the constitution, confer upon an administrative officer a large measure of discretion, provided the exercise thereof is controlled and guided by rules prescribed therefor (*Arwine* v. *Board of Medical Examiners,* 151 Cal. 499 [91 Pac. 319]; *Hall* v. *Geiger-Jones Co.,* 242 U. S. 539, 553 [Ann. Cas. 1917C, 643, L. R. A. 1917F, 514, 61 L. Ed. 480, 37 Sup. Ct. Rep. 217]), even though, in exercising that discretion, he may be called upon to exercise judgment of a high order.   (*Frasher* v. *Rader,* 124 Cal. 132 [56 Pac. 979]; *Cook* v. *Civil Service Com.,* 160 Cal. 589, 592 [117 Pac. 663]; *Suckow* v. *Alderson,* 182 Cal. 247 [187 Pac. 965]; *People* v. *Sacramento Drainage Dist.,* 155 Cal. 373 [103 Pac. 207].)

The difficulty herein lies not so much in the ascertainment of the settled rules of constitutional law as in their

correct application to the various provisions under consideration. [10] The provision in section 1 authorizing the state engineer to employ such engineers, attorneys, and other assistants as he may deem necessary, and to fix their compensation, does not contravene the rule in *Farrell* v. *Board of Trustees,* 85 Cal. 408 [24 Pac. 868], for two reasons: First, because the assistants here provided for are not officers but mere employees; second, because the discretion as to the number to be employed is not unguided, as it was in the Farrell case. The phrase "such as he may deem necessary," as here used, is precisely analogous to the provision under consideration in the case of *Riley* v. *Chambers, supra,* and which was there held not to confer arbitrary power. It was there said: "While the commissioner has the power to refuse a license if he is not satisfied as to the character of the applicant, his discretion is not arbitrary. There must exist facts which reasonably justify his conclusion that the applicant is not of good character and reputation." Yet the law there under consideration did not expressly so state. This requirement was implied therein.

[11] It is provided in section 5 that the engineer "shall ascertain and determine the practicability, feasibility and utility of the proposed project." This does not appear to be an attempted delegation of legislative or judicial power, because no consequences are made to depend upon such determination or to result therefrom. It calls rather for the performance of administrative functions, evidently intended only for information and guidance of voters.

[12] It is also provided that he may employ all necessary engineers, attorneys, and assistants; that the cost thereof shall be deemed a part of the expense of said project, and that he "may require the same to be paid by the proponents of said district, or he may issue warrants therefor." Section 16 requires the board of directors to levy an assessment of an equal amount per acre upon the land of such district to pay such warrants. This amounts, in effect, to an attempted delegation to the engineer of the legislative power to levy taxes. If he elects to issue the warrants, a mandatory duty is thereby imposed upon the directors to levy an assessment sufficient to pay the same; but if he elects to require these expenses to be paid by the proponents of

the district, the assessment will not be levied. Thus the decision to levy or not to levy this assessment is committed wholly to the discretion of the engineer, and in the exercise of this discretion he is uncontrolled and unguided by anything to be found in the act. If the act had made it the mandatory duty of the engineer to issue warrants for these necessary expenses and the mandatory duty of the directors to levy an assessment to pay those warrants, then it might well be said that such assessment was in fact levied, not by the engineer or by the directors, but by the legislature itself. But where, as here, the power to decide whether or not a given tax shall be levied is committed to the uncontrolled and unguided discretion of an executive officer, it amounts to such a delegation of legislative power as is prohibited by the constitution. It follows that the provision for the levy of an assessment for the payment of such warrants is void. This does not, however, render the act unworkable, because the engineer may require the necessary cost of these investigations to be paid by the proponents of the project.

[13] Section 6 provides that upon the final hearing the engineer shall make an order affirming the sufficiency of the petition and notice of hearing, and determining the practicability, etc., of the project, and "shall also in his said order establish the boundaries of the proposed district or describe the lands included therein, specify the location proposed for the storage of water to be used for any of the purposes of this act, and provide an estimate of the probable cost of the proposed project; and in so doing shall make such changes in any of the matters or proposals set forth in said petition as he may deem advisable . . ." It is claimed that these provisions purport to vest in the engineer the arbitrary power to make such changes in the boundaries of the proposed district, or in the location and character of the proposed works therein, as he may see fit, thus bringing this situation within the rule of *People* v. *Parks, supra.* We do not so construe the act. It seems apparent from a consideration of its various provisions, particularly those contained in sections 3, 5, and 6, that in establishing the boundaries of the proposed district the engineer can make changes in the boundaries of the district as proposed in but two classes of cases: (1) He can exclude land therefrom

when in response to objections filed by the owners thereof
he finds as a fact that it is not of the character described
in the act, i. e., "already irrigated or susceptible of irriga-
tion from the common source and by the same system of
storage and irrigation works"; (2) He can include other
land therein when in response to petition filed by the own-
ers thereof he finds as a fact that it is of the character
described in the act. The authority to make changes other
than these was evidently intended to apply only to the pro-
posal or recommendation of such changes, in connection with
providing an estimate of probable cost. It is obvious, for
example, that the locations for the storage of water, either
as proposed in the original petition, or as recommended by
the engineer, would at the most be merely advisory upon
the board of directors, and subject to change thereafter as
the directors should deem best.

[14] The provisions for the division of the district into
five to eleven divisions "possessing the same general charac-
ter of water rights or interests," and for the establishment
of "a convenient number" of election precincts, confer
not arbitrary authority but a controlled and guided discre-
tion dependent upon the facts ascertained. It is not neces-
sary herein to determine whether the provisions of section
18, authorizing the engineer, under certain conditions to
declare the project abandoned, and the provisions of section
53, authorizing him to determine when the public interest
requires the making of certain investigations, are or are not
valid. The practical operation of the law is in no way de-
pendent upon either of them.

[15] We come now to the contention of respondents that
the provisions of section 16, for the levy of assessments at
a flat rate per acre upon all the lands of the district to
defray the general expenses of the district, prior to any
hearings on the question of benefits, require the taking of
private property without due process of law. [16] The
general rule on this subject is that a hearing as to benefits
must be provided at some time before the land is finally
burdened by the assessment. (*Fallbrook Irr. Dist.* v. *Brad-
ley, supra; Nickey* v. *Stearns Rancho Co.,* 126 Cal. 150 [58
Pac. 459].) But this general rule is subject to an equally
well-established exception, the existence of which is recog-
nized by respondents and well stated in the following lan-

guage from their brief: "Of course, when the legislature itself determines the boundaries of the district, either by describing them or *by laying down a fixed rule by which they may be determined,* the property owners affected are not entitled to a hearing for they are conclusively presumed to have been heard through their representatives in the legislature." (Italics ours.) (See *Hadley* v. *Dague,* 130 Cal. 207, 219 [62 Pac. 500]; *Duncan* v. *Ramish,* 142 Cal. 686 [76 Pac. 661]; *Ross* v. *Barber Asphalt Pav. Co.,* 158 Cal. 37 [109 Pac. 883]; *Larsen* v. *San Francisco,* 182 Cal. 1, 14 [186 Pac. 757]; *Miller & Lux* v. *Drainage Dist.,* 182 Cal. 252, 265 [187 Pac. 1041]; *Houck* v. *Little River Drainage Dist.,* 239 U. S. 254 [60 L. Ed. 266, 274, 36 Sup. Ct. Rep. 58, see, also, Rose's U. S. Notes]; *Northern Pac. R. R. Co.* v. *Pierce Co.,* 51 Wash. 12 [23 L. R. A. (N. S.) 286, 97 Pac. 1099].) The legislature herein has done precisely that thing. It has itself determined the boundaries of the district, "by laying down a fixed rule by which they may be determined." It provided, in sections 3 and 5 of the act, in substance, that the district shall include those lands, and only those lands, which are "already irrigated or susceptible of irrigation from a common source and by the same system of storage and irrigation works," and it provided for a hearing before the state engineer upon this question, after notice, at which each property owner affected might appear and present his claim to be either excluded from or included in the proposed district. This amounts to a legislative declaration that all the lands of the described character will be uniformly benefited to the extent of the necessary cost of the organization and investigation work of such a district. Such legislative determination is conclusive, "unless the state's action has been palpably arbitrary or grossly unequal in its application to the persons concerned." (*Miller & Lux* v. *Drainage Dist., supra.*) The claim here made that the act is grossly unequal in its application to the land owner who now has a perfected and adequate water right is the same which was there made with respect to the land owner whose land had already been fully reclaimed. As it was pointed out there that such an owner might be benefited by works resulting in the lowering of the flood plane and thereby decreasing the general danger of destructive floods, so it is apparent here that the

owner who now has an adequate water right may nevertheless be benefited by conservation and storage works which serve to increase the total available supply of water within the district. The provisions for preliminary assessments being thus predicated upon a valid legislative determination as to benefits, do not constitute a taking of property without due process. The case of *Redman* v. *Kyle,* 76 Fla. 79 [80 South. 300], is in direct conflict with *Miller & Lux* v. *Drainage Dist., supra,* and, therefore, is not to be followed here.

[17] As to the provisions of section 19, providing for the levy of what may be called the main assessment, the contentions of respondents that the act does not provide for a hearing as to benefits and does not specify the rules by which the board is to proceed in modifying or amending the assessment are substantially the same as those which were raised and disposed of in *Fallbrook Irr. Dist.* v. *Bradley, supra.* It is not necessary that the notice of hearing shall expressly state that the assessment-roll has been filed in the office of the state engineer. The law requires that it must be so filed before the notice is given. It may be unfortunate that the act does not require copies of the assessment-roll to be filed in each county within the district, but the absence of such requirement does not constitute failure of due process. [18] The failure of the act to specify the length of notice which must be given the property owners of a proposed increased assessment is not fatal. "In the absence of a controlling statute fixing the time of notice, the property owner must be given time to have and must have a full and fair hearing." (*Huntley* v. *Board of Trustees,* 165 Cal. 298, 304 [131 Pac. 859, 862].) It is not here necessary to determine the validity of the provisions of sections 22 and 23 for the levying of additional assessments.

[19] We do not understand that the act contemplates the sale of water or hydro-electric power to others than the inhabitants of the district, to whose uses it is dedicated (except as to a possible surplus thereof), and it does not appear, therefore, to provide for a taking of private property for a private use.

[20] The act is not violative of sections 12 or 13 of article XI of the constitution, because, as we have seen, the attempt to confer upon the engineer the power to issue warrants which should automatically result in the levy of assess-

ments is nugatory. The adjustment board is given no power under the act to levy assessments, but merely to apportion them.

[21] The act does not violate section 24 of article I, or section 1 of article II, in that it denies to any but land owners the right to vote at district elections. It is true that this court, in the case of *In re Madera Irr. Dist.*, 92 Cal. 296, 321 [27 Am. St. Rep. 106, 14 L. R. A. 755, 28 Pac. 272, 675], used language strongly intimating that such a provision would be unconstitutional as applied to an irrigation district. It is interesting to note that the court was there considering the claim that the Wright Act was unconstitutional because it did *not* limit the voting right to the land owners. However, it is now clear, in the light of the later decisions, that those provisions of the constitution "refer to the qualification of electors entitling them to vote at the ordinary elections, local and general, held in the course of the usual functions of civil government." (*Wheeler* v. *Herbert*, 152 Cal. 224, 232 [92 Pac. 353, 357]. See, also, *Martinelli* v. *Morrow*, 172 Cal. 472 [156 Pac. 1017]; *Board of Directors* v. *Peterson*, 64 Or. 46 [129 Pac. 123].) "By this and like provisions, the legislature is not dealing with elections, with suffrage, or with the ballot, within the meaning of the constitution and the election laws of the state. The formation of this and similar districts is a function pertaining purely to the legislative branch of the government. Wherefore it may do so by giving such persons as it may think best an opportunity to be heard." (*Potter* v. *Santa Barbara*, 160 Cal. 349, 355 [116 Pac. 1101, 1103].) The decisions of the Idaho court to the contrary, based upon the view that these districts are *political* subdivisions of the state, are out of harmony with the decisions of this state. This disposes also of the contention that the act violates section 5, article II, of the constitution, providing for the secrecy of the ballot.

[22] The claims that the act confers judicial powers upon the state engineer, that in the adjustment board it has attempted to create a court, and that this board is called upon to exercise judicial powers, are well answered by what was said by this court in *People* v. *Sacramento Drainage Dist.*, 155 Cal., at pages 387, 388 [103 Pac. 207]. It is of interest to note that nearly all of the objections presented by

respondents were urged against the constitutionality of the Wright Act in *In re Madera Irr. Dist.*, 92 Cal. 296 [27 Am. St. Rep. 106, 14 L. R. A. 755, 28 Pac. 272, 675], and in *Fallbrook Irr. Dist.* v. *Bradley*, 164 U. S. 112 [41 L. Ed. 369, 17 Sup. Ct. Rep. 56, see, also, Rose's U. S. notes].

[23] We do not find the act here in question to be unconstitutional in any of the provisions essential to its practical operation, and it remains only to consider the question of misjoinder of parties, raised by the special demurrer. Respondents contend that the department of public works and A. B. Fletcher, as director of public works, should be dismissed as parties herein for the reason that neither of them has any duties to perform in this connection, and that the state engineer is given original, complete, and final authority under the terms of this act. The state department of public works was reorganized by the 1921 legislature (chapters 602 and 607), the office of state engineer, as it theretofore existed, was thereby abolished and merged in the department of public works, and a new office of state engineer was thereby created as chief of the division of engineering and irrigation of the department of public works. Respondents contend that inasmuch as the reorganization acts, chapters 602 and 607, went into effect three days before the Water Storage Act, the references in the latter to the "state engineer" must be held to refer to the office newly created by the former acts, and not to the pre-existing office, the powers and duties of which had been transferred to the department of public works. We are not inclined to this view. Chapter 607 provided that "whenever by the provisions of any statute or law now in force *or that may hereafter be enacted* a duty or jurisdiction is imposed or authority conferred upon any of said bodies, officers, deputies or employees, or upon any other person by any statute, the enforcement of which is transferred to the department, such duty, jurisdiction and authority are hereby imposed upon and transferred to the department of public works and the appropriate officers thereof, with the same force and effect *as though the title of said department had been specifically set forth and named therein.*" (Italics ours.) A similar provision is found in chapter 602. Although these two chapters actually went into effect three days before the Water Storage Act, they were all pending

in the legislature at the same time, and all went to the Governor on the same day. No one in the legislature, or out, could foretell which of them might be signed first. [24] It is thus apparent that the italicized provisions above quoted were probably inserted to cover just such a situation as here arose, and that the words "state engineer," wherever they appear in the Water Storage Act, should be held to refer to the "department of public works and the appropriate officers thereof." This conclusion harmonizes with the evident policy of that legislature to consolidate and co-ordinate the various administrative departments of the state government and to centralize the authority and responsibility therein.

Respondents' demurrer is overruled, and it is ordered that a peremptory writ of mandate issue herein as prayed.

Kerrigan, J., Lennon, J., Waste, J,. Wilbur, C. J., Lawlor, J., and Seawell, J., concurred.