[No. C024834. Third Dist. July 23, 1997.]

SANTA ANA HOSPITAL MEDICAL CENTER, Plaintiff and Appellant,
v.
S. KIMBERLY BELSHÉ, as Director, etc., Defendant and Respondent.

## COUNSEL

Douglas S. Cumming for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Dennis Eckhart and Barbara Haukedalen, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

SIMS, J.—Appellant Santa Ana Hospital Medical Center appeals from the trial court's denial of its petition for a writ of mandate (Code Civ. Proc. § 1085) against S. Kimberly Belshé, as Director of the California Department of Health Services (for ease of reference referred to herein as the Department). Appellant contends the trial court erred in interpreting Welfare and Institutions Code section 14105.98[1] as precluding judicial relief to correct an error by the Department in determining appellant's share of supplemental Medi-Cal payments under the "disproportionate share hospital" (DSH) program which provides supplemental payments to hospitals

---

[1]Undesignated statutory references are to the Welfare and Institutions Code.

serving a disproportionate number of low-income patients. We shall affirm the trial court's denial of the writ petition.

## THE STATUTORY FRAMEWORK

"The Medi-Cal program (§ 14000 et seq.) represents California's implementation of the federal Medicaid program (42 U.S.C. §§ 1396-1396v), through which the federal government provides financial assistance to states so that they may furnish medical care to qualified indigent persons. [Citation.] The Department is the single state agency designated to administer the Medi-Cal program. (§ 14203.)" (*Robert F. Kennedy Medical Center* v. *Belshé* (1996) 13 Cal.4th 748, 751 [55 Cal.Rptr.2d 107, 919 P.2d 721] (*Kennedy Medical Center*) [addressing disputes concerning payment for services rendered].)

Federal law originally required states to reimburse health care providers for the "reasonable cost" of services rendered, i.e., the cost of services actually incurred by the provider and otherwise allowable by Medicaid. (*Kennedy Medical Center, supra*, 13 Cal.4th at p. 751.) In 1980 and 1981, "in an effort to contain spiraling Medicaid costs for hospital services," the federal law was changed to allow states to develop alternate methodologies to limit reimbursement based upon costs that would have been reasonably incurred by an "efficient and economically operated facility," even if a provider's actual costs were greater. (*Id.* at pp. 751-752, citing 42 U.S.C. § 1396a(13)(A).)

In calculating Medi-Cal reimbursement in this state, the provider is given full credit for certain costs, such as rent and taxes, but not for other costs, such as costs of services that have increased significantly over those incurred in prior years. (*Kennedy Medical Center, supra*, 13 Cal.4th at p. 752, citing Cal. Code Regs., tit. 22, § 50000 et seq.)

Thus, Medi-Cal reimbursement may not fully cover a hospital's costs.

In addition to reimbursement under the foregoing provisions, hospitals which provide care for a disproportionate share of low-income patients may be eligible to receive a supplemental payment under the state's DSH program, enacted to take advantage of a federal program making matching federal funds available to the states. (§ 14105.98; Stats. 1991, ch. 279, pp. 1762-1779; Stats. 1991, ch. 1046, pp. 4824-4845.) Under this program, governmental entities that operate hospitals (i.e., counties, hospital districts, and the University of California) transfer funds to the state. After deduction of an administrative fee for the state, these funds draw matching federal

funds, and the combined moneys are then distributed among public and private hospitals which qualify as DSH's based on their provision of services to a disproportionate number of Medi-Cal or other low-income patients. (§ 14105.98, subd. (a)(1); see Sen. Rules Com., 3d reading analysis of Assem. Bill No. 2804 (1996 Reg. Sess.) June 20, 1996 [giving background on DSH program].)

An uncodified section of the 1991 enactment of the DSH program stated in part: "Several federal medicaid statutory amendments over the past decade have encouraged and directed states to provide, as part of their state medicaid programs, special recognition and higher payment amounts to hospitals that provide services to a disproportionate number of medicaid and other low-income patients. These statutory provisions . . . were intended by Congress to assist those 'safety net' hospitals, particularly public hospitals and teaching hospitals, that face significant financial distress due to changing economic circumstances in the health care industry. The concept of higher medicaid payments to disproportionate share hospitals is intended to assist economically endangered facilities in meeting their rising costs of uncompensated care relating to uninsured and underinsured patients. . . ." (Stats. 1991, ch. 279, § 1 (f), p. 1763.) The state enactment continues: "It is the intent of the Legislature to provide for additional Medi-Cal payment adjustments for inpatient services rendered by disproportionate share hospitals, particularly those hospitals that have proportionately higher 'low-income utilization rate' percentages, since many of these facilities are confronted by substantial economic distress. It is also the intent of the Legislature to utilize a portion of the local financial participation to fund other critical Medi-Cal health care expenditures. It is the further intent of the Legislature to obtain the full extent of federal financial participation permitted under federal law for expenditures under the Medi-Cal program." (Stats. 1991, ch. 279, § 1(i), p. 1764.)

The statutory scheme provides: "For each fiscal year commencing with 1991-92, there shall be Medi-Cal payment adjustment amounts paid to hospitals pursuant to this section. The amount of payments made and the eligible hospitals for each payment adjustment year shall be determined in accordance with the provisions of this section. The payments are intended to support health care services rendered by disproportionate share hospitals." (§ 14105.98, subd. (b).)

"For each fiscal year commencing with 1991-92, the department shall issue a disproportionate share list. The list shall be developed in accordance with subdivisions (e) and (f), and shall serve as a basis for payments under

this section for the particular payment adjustment year." (§ 14105.98, subd. (c).)

Section 14105.98, subdivision (f)(1),[2] provides for issuance of the disproportionate share list by the Department.

Section 14105.98, subdivision (f)(5),[3] prescribes finality of the list upon issuance and prohibits modification of the list after issuance, except for mathematical or typographical errors made in preparation of the list.

Section 14105.98, subdivision (s),[4] limits review of the list and provides there shall be no appeal from calculations which are final pursuant to subdivision (f)(5).

As will appear, the dispute in this case focuses on the question whether errors in a DSH list may be corrected. This implicates section 14105.98.

---

[2]Section 14105.98, subdivision (f)(1), provides in part: "For the 1991-92 payment adjustment year, a disproportionate share list shall be issued by the department no later than 65 days after the enactment of this section. For subsequent payment adjustment years, a tentative listing shall be prepared by the department at least 60 days before the beginning of the particular payment adjustment year, and a disproportionate share list shall be issued no later than five days after the beginning of the particular payment adjustment year. All state agencies shall take all necessary steps to supply the most recent data available to the department to meet these deadlines. The Office of Statewide Health Planning and Development shall provide to the department quarterly access to the edited and unedited confidential patient discharge data files for all Medi-Cal eligible patients. The department shall maintain the confidentiality of that data to the same extent as is required of the Office of Statewide Health Planning and Development. In addition, the Office of Statewide Health Planning and Development shall provide to the department no later than March 1 of each year, the data specified by the department, as the data existed on the statewide data base file as of February 1 of each year . . . from all of the following [hospital reports, etc.]."

[3]Section 14105.98, subdivision (f)(5), provides: "For purposes of payment adjustment amounts under this section, each disproportionate share list shall be considered complete when issued by the department pursuant to paragraph (1). Nothing on a disproportionate share list, once issued by the department, shall be modified for any reason, other than mathematical or typographical errors or omissions on the part of the department or the Office of Statewide Health Planning and Development in preparation of the list."

[4]Section 14105.98, subdivision (s), provides "(1) The department may utilize existing administrative appeal procedures for purposes of any appealable matter that arises under the payment adjustment program. The matters that may be appealed shall be limited to those related to the following:

"(A) Paragraph (5) of subdivision (f).

"(B) State audit disallowances of amounts paid to hospitals under the payment adjustment program.

"(2) Calculations which are final pursuant to paragraph (4) or (5) of subdivision (f) or the procedures or data on which those calculations are based, shall not be appealed."

## FACTUAL AND PROCEDURAL BACKGROUND

On November 16, 1995, appellant filed in the trial court a petition for writ of mandate (Code Civ. Proc., § 1085) seeking judicial review of the Department's refusal to correct an admitted inaccuracy in its DSH list for fiscal year 1994-1995, from which appellant's DSH payments for 1994-1995 were determined. The error assertedly resulted in reduced DSH payments to appellant.

Exhibits attached to the petition in the trial court included letters between the parties, recounting the following:

On December 16, 1994, the Department issued its DSH list for 1994-1995. As noted, once issued the list is final and cannot be modified, except for typographical or mathematical errors made in preparation of the list. (§ 14105.98, subd. (f)(5), fn. 3, *ante*; 14105.98, subd. (s), fn. 4, *ante*.)

Sometime in December 1994, after the December 16th issuance of the list, appellant (a private hospital) contacted the Department by telephone and said the Department had made an error in counting appellant's 1993 patient days by failing to double the obstetric (OB) codes to take into account the newborns.[5]

In a letter dated April 21, 1995, the Department responded to a February 7, 1995, letter from appellant (the February 7th letter is not part of the record) concerning this claim of error. The Department's letter stated it made a "cursory review" of appellant's claim and determined it was unfounded. The cursory nature of the review was because staff efforts were directed to issues which could be corrected, i.e., mathematical and typographical errors in preparation of the list. Such errors (unrelated to appellant) were found, and a modified list was issued January 31, 1995. Thereafter, upon receipt of appellant's February 7th letter, the Department researched the discrepancy between its determination of appellant's "cap days" and appellant's determination. The Department found appellant had changed from a "contracting OB rate-per-discharge hospital" to a "contracting all-inclusive rate-per-discharge hospital" during 1993. This change, not the count of newborn days, accounted for the discrepancy. The Department stated it had been unaware of the change. The Department indicated it would adjust the DSH program for future years but not for the 1994-1995 year.

---

[5]The statutory scheme calls for issuance of a "tentative listing" before the final list is issued. (§ 14105.98, subd. (f)(1) ["a tentative listing shall be prepared by the department at least 60 days before the beginning of the particular payment adjustment year, and a disproportionate share list shall be issued no later than five days after the beginning of the particular payment adjustment year"].) Presumably, corrections may be made at the tentative stage. It is not clear why the dispute in this case was not resolved at the tentative stage.

By letter dated May 4, 1995, appellant asserted it had no obligation to notify the Department of changes in appellant's Medi-Cal contract so as to assist the Department in its mandated responsibilities.

In further correspondence, the Department acknowledged "we inadvertently failed to include certain general acute care accommodation codes specific to a change in the contract. This failure caused us to set the allowable day cap at 11,282 rather than 13,582." The Department stated the statute precluded it from making a correction, since this was not a mathematical or typographical error made in preparation of the DSH list. The Department further stated corrections are discretionary, and it must evaluate their potential impact on all DSH hospitals; therefore, even if the statute permitted change, it did not require change.

In opposing the writ petition in the trial court, the Department submitted a declaration from Carolynn Michaels, the Department's chief of the disproportionate share unit. She attested in part as follows:

". . . The DSH Supplemental Payment Adjustment Program is a federally mandated program. The program is designed to recognize those hospitals which serve a disproportionate number of Medicaid (Medi-Cal in California) and low income/charity patients and to compensate these providers for their unrecovered costs of caring for Medicaid and other indigent patients. In California, this program is administered by [the Department] on a state fiscal year basis. The total program dollars available for each federal fiscal year is capped at $2.19 billion. These funds represent 50% federal dollars and 50% intergovernmental transfers (from counties, hospital districts and the University of California Regents). The DSH program has no state funding.

". . . Each year, the Department determines which California hospitals are eligible to participate in the DSH program for that particular year. Hospitals do not apply for the DSH program. The Department calculates eligibility for the program from historical data. These calculations are based on the federal requirements for eligibility as set forth in subdivision (d) of section 1396r-4 of title 42 of the United States Code, and the California Medicaid State Plan. Eligibility to participate in the DSH program hinges on two factors: the hospital's 'Medicaid utilization rate' and/or its 'low income utilization rate.'

". . . Each year, after the eligibility determination is completed, the Department issues the DSH list. The 'disproportionate share list,' defined in . . . section 14105.98(a)(1), 'means an annual list of disproportionate share hospitals that provide acute inpatient services issued by the department for

purpose[s] of this section.' Components of the DSH list are identified in . . . section 14105.98(f)(2), . . .' (A) The name and license number of the hospital. (B) Expressed as a percentage, the hospital's . . . Medi-Cal utilization rate and low-income utilization rate . . . . (C) Based on the hospital's low-income utilization rate, the hospital's low income number.' These components are the only defined elements on the DSH list as published each year by the Department."

Michaels attested the DSH list for the 1994-1995 year was issued on December 16, 1994. An error capable of correction (not the error of which appellant complains) was corrected, and a modified list was issued on January 31, 1995. The error of which appellant complained could not be corrected because it was an alleged error in the "cap" on DSH payments, and the "cap" is not an element of the DSH list and therefore is not subject to correction under section 14105.98.[6]

Michaels further attested: "Once the eligibility list is issued, the Department compiles additional data on the eligible hospitals and performs several specific calculations to determine each hospital's 'projected total payment adjustment.' This process is in section 14105.98 and in the California Medicaid State Plan (Attachment 4.19-A).[7] When these calculations are completed, the projected total payment adjustment amount is communicated via letter to each hospital.

". . . The methodology the Department utilizes in determining each transferor entity's intergovernmental transfer amount is identified in . . . section 14163. Although the methodology is fairly complex, simply put, transferring entities (counties, U.C. Regents and hospital districts) are those which have an associated hospital participating in the DSH program for the specific year. For example, Sacramento County does not participate in the funding of this program because there is no County hospital. On the other hand, U.C. Davis is a DSH eligible hospital and their 'public entity' (the U.C. Regents) do[es] participate in making intergovernmental transfers. The actual amount each transferring entity is assessed is proportional to the amount of dollars their hospital(s) is (are) projected to receive in the DSH

[6]This assertion was disputed in a declaration of a health care consultant (James Foley), submitted to the trial court by appellant. Foley declared the determination of the "cap" on DSH payments is made by the Department as part and parcel of the preparation of the DSH list itself, the DSH list reflects not only the identity of DSH hospitals but also the amount of DSH payments they will receive, and the amount cannot be calculated without determining the "cap" for each hospital.

[7]Section 14105.98, subdivision (f)(4), requires the Department to use methodology contained in attachment 4.19-A in determining hospital utilization rates for purposes of the DSH list.

program year. In total, all transferring entities must pay into the state's Medi-Cal Inpatient Payment Adjustment (MIPA) fund an amount equal to fifty percent of the total projected hospital payments to be made to all participating hospitals (public and private), which constitutes the non-federal share of the total payments.

". . . Each year, after the issuance of the DSH list and the projected payment amounts for each of the eligible hospitals, the Department receives inquiries from hospitals which seek clarification on how the calculations were computed. The Department works closely with these hospitals, explaining the sources of the data and the specific formulas used in performing the calculations, emphasizing the finality of the process. The most important point made to these hospitals is that, once all of the calculations are performed and the transfer[] or entities are billed for the specific intergovernmental transfer, there is no reconsideration of data. A case-by-case review of all inquiries made at the beginning of each payment adjustment year, would have a devastating impact on the entire process of calculating eligibility, projected payment amounts, and beginning with the 1995/96 payment adjustment year, the OBRA [Omnibus Budget Reconciliation Act] '93 limits, as well as the transfer[]or entity intergovernmental payment amounts. All calculations and resulting individual hospital payment amounts are interrelated and impact each future step. Individual hospital challenges to various aspects of each of the calculations would cause indefinite delays in payments, pending resolution of all problems. All final payment and transfer amounts are dependent on each other, so as to have a domino effect, and the ultimate start of the dollars flowing to hospitals depends upon the finality of all calculations. Thus, the petitioner's request to change their data for the 1994-95 year would require the recalculation and redistribution of all intergovernmental transfers and hospital payments.[8]

". . . The alleged 'error' that the petitioner alludes to is contained in a portion of the data utilized by the Department to determine the projected total payment adjustment amount as described in paragraph #11, above. However, as noted in paragraph #13, once all of the interrelated calculations are completed and the corresponding payment amounts and transfer amounts are communicated, calculations are final."

The Michaels declaration further explained: ". . . During the time period between the issuance of the original DSH list and the issuance of the modified DSH list, the Department only corrected the error which specifically dealt with eligibility determination of hospitals for inclusion on the DSH list as authorized by section 14105.98(f)(5). A mathematical error was

---

[8]Simply stated, it is a zero sum game.

made in the calculation of the Medicaid Utilization Rate (MUR). When calculating the denominator, an incorrect variable was inadvertently accessed from the data base. The number used for 'total days' in the denominator inaccurately included sub-acute days, long term days, intermediate care days, residential days, and long term psychiatric days. A less significant error was also made. The nursery days were added twice when computing the denominator of the fraction for hospitals reporting on the 'old' OSHPD [Office of Statewide Health Planning and Development] reporting form. This part of the calculation was performed correctly for hospitals reporting on the 'new' OSHPD form. These mathematical errors resulted in a lower MUR for many hospitals and a lower MUR eligibility threshold number (one standard deviation above the mean). In sum, these calculations affected only the MUR eligibility determination as to which hospitals would be on the DSH list, as opposed to affecting the calculation of individual hospital payment amounts, which occurs at a later time."

Appellant replied with a declaration of a health care consultant, James Foley, who stated in part that the Department could have easily corrected the error with respect to appellant at the same time the Department withdrew the DSH list for correction of the mathematical error unrelated to appellant. Foley further declared, with respect to the "domino effect" of making corrections, "based upon my review of hundreds of DSH calculations, the error at issue in this case is unusual, perhaps even unique. I am aware of only a handful of other DSH challenges, and none of them involve the specific problem at issue here, and indeed two of them do not relate to determination of the 'cap' at all, but rather to the petitioner-hospitals' basic eligibility for DSH payments."

Following a hearing, the trial court on July 11, 1996, filed its "ORDER AND JUDGMENT," stating in part as follows:

"1. [Appellant's] requests that the Court issue a peremptory writ of mandate requiring Health Services to increase [appellant's] payments under the disproportionate share hospital (DSH) program for the 1994-95 fiscal year, and for any other relief, are denied.

"2. It is found that Health Services made a mistake in calculating the payments to petitioner in that the computer followed an incorrect code. Such a mistake was not made in preparation of the list and is not correctable as a mathematical or typographical error or an omission on the part of Health Services or the Office of Statewide Health Planning and Development. The mistake was not arbitrary and capricious and did not constitute an abuse of discretion.

"3. The Legislature has determined that errors made in the administration of the DSH program are not appealable, with certain non-applicable exceptions. Administration of the DSH program is so interrelated and complicated - the program would come to a halt if independent hospitals were able to appeal determinations once the list has been issued. The lack of the ability to appeal in light of the interdependence of the program is not an untoward infringement, and does not rise to a constitutional challenge. Some harm is permitted in aid of the greater cause. Relief available under the DSH program is prospective. The Court specifically determines that retrospective relief is not available and that there will be no redeterminations of hospitals eligible to be on the DSH list or of allocation of funds for any previous periods."

The hospital appeals.

## DISCUSSION

### I. *Standard of Review*

■ "In reviewing the trial court's ruling on a writ of mandate [under Code of Civil Procedure section 1085], the appellate court is ordinarily confined to an inquiry as to whether the findings and judgment of the trial court are supported by substantial, credible and competent evidence. This limitation, however, does not apply to resolution of questions of law where the facts are undisputed. In such cases, as in other instances involving matters of law, the appellate court is not bound by the trial court's decision, but may make its own determination. [Citation.]" (*Rodriguez* v. *Solis* (1991) 1 Cal.App.4th 495, 502 [2 Cal.Rptr.2d 50].) This appeal presents questions of law subject to de novo review.

### II. *Appellant's Contentions*

#### A. *Citation to Trial Court Opinion in Unrelated Case*

■ We first reject appellant's reliance on a trial court opinion in an unrelated case.

In its opening brief on appeal, appellant attached as an appendix to its brief a copy of a trial court's "RULING ON SUBMITTED MATTER" in an unrelated case (CHCM, Inc. v. Belshé (Super. Ct. Sacramento County, No. 96CS01023) ruling of Sept. 3, 1996) (CHCM) which assertedly raised similar issues concerning correctability of errors in DSH payment adjustments. Appellant requested that we take judicial notice of this unpublished

ruling. Appellant's counsel later withdrew the request for judicial notice in a letter to this court dated February 3, 1997, in which counsel stated the request was being withdrawn because it was assertedly inappropriate to make such a request in a brief. Counsel stated he merely intended to ask this court to consider the CHCM ruling as "relevant authority concerning the same general subject matter raised in the present case." Appellant's reply brief repeats the request that we consider the CHCM ruling.

We decline to consider the CHCM ruling. Even assuming for the sake of argument that the CHCM case involves the same issue as the case before us (a point disputed by the Department), a written trial court ruling has no precedential value. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 763, pp. 730-731.)

Asserting that California Rules of Court, rule 977, precludes only citation of unreported *appellate* opinions, appellant leaps to the illogical conclusion that unreported *trial court* opinions are citable authority. Appellant cites Witkin for the proposition that trial court decisions may be considered instructive and persuasive, particularly where there is no binding higher authority. (9 Witkin, Cal. Procedure, *supra*, § 763, pp. 730-731.) However, what the cited treatise says is "The doctrine [of stare decisis] applies only to decisions of appellate courts. *Trial courts* make no binding precedents. . . . [¶] But such decisions [trial court decisions and administrative tribunal decisions] are by no means ignored; when collected and readily available for study, they may be cited for their persuasive value, and are occasionally followed in the absence of controlling higher authority. Examples are: [¶] (1) *Coffey's Probate Decisions* . . . [and administrative decisions of workers' compensation appeals board, public utilities commission, and unemployment insurance board]." (*Ibid.*, original italics.)

Here, the isolated ruling (which was not even a judgment or order) was not part of any compilation such as *Coffey's Probate Decisions*.

We decline to consider the ruling in the CHCM case.

B. *Availability of Judicial Review*

Appellant contends the trial court erred in interpreting section 14105.98 as precluding judicial review. However, there *was* judicial review in this case. The trial court found the Department erred in its calculation, but this was a type of error that was not correctable retrospectively under the statute. Thus, even though the trial court referred to the statute as foreclosing appeal of Department action, the court did provide judicial review. Accordingly, the

issue in this appeal is not unavailability of judicial review but unavailability of a retrospective remedy (i.e., legislative limitation of the remedy).[9] Since appellant got judicial review, we need not decide whether judicial review is unavailable under section 14105.98.

### C. *This Was Not a Mathematical Error*

■ Appellant contends the error in this case was correctable, because it was a mathematical error made in preparation of the list, and section 14105.98, subdivisions (f)(5) and (s) (fns. 3 & 4, *ante*), make such an error reviewable and correctable. We disagree that the error was a mathematical error.

The error in this case was that the Department used an incorrect code, failing to include certain general acute care accommodation codes specific to a change in appellant's Medicaid contract. This failure caused the Department to set the allowable day cap at 11,282 rather than 13,582. Appellant asserts the error was due to inclusion of an understated number of newborn patients in the determination of the payment "cap." The Department asserts the error was due to its unawareness that appellant had changed from a "contracting OB rate-per-discharge hospital" to a "contracting all-inclusive rate-per-discharge hospital."

In either event, the error was not within the common meaning of "mathematical error," which connotes a mistake in addition, subtraction, multiplication or division.

Appellant urges a broader meaning for "mathematical error." Appellant cites Webster's Dictionary as defining "mathematical" as " '1. Of or relating to mathematics. 2. Precise: exact. 3. Absolute: certain.' (Webster's II, New Riverside University Dictionary (1984) p. 733.)" Appellant further cites the same dictionary's definition of "Mathematics" as " 'The study of numbers and their form, arrangement, and associated relationships, using rigorously defined literal, numerical, and operational symbols.' " (*Ibid.*) According to appellant, this broad definition "lends itself to a theory" that where the wrong numbers are used in a calculation, a mathematical error has been made.

We disagree. Under appellant's construction, every error would be a "mathematical error." We believe the statute carries the common meaning of

---

[9]No issue is raised in this case as to whether section 14105.98 precludes declaratory or injunctive relief for future years in the event of a dispute over calculation. The Department acknowledged it made a mistake and indicated it would use the correct codes in future years.

"mathematical error" as a mistake in addition, subtraction, multiplication or division. The error in this case was not a mathematical error.

Since we conclude there was no mathematical error, we need not address appellant's argument as to whether the error was made "in preparation of" the list.[10]

### D. *Separation of Powers*

 Appellant contends the trial court's decision violates the separation of powers doctrine (Cal. Const., art. III, § 3[11]), because it allows the Legislature to vest the executive branch (the Department) with uncontrolled discretion. We disagree.

The separation of powers doctrine was recently discussed in *Superior Court* v. *County of Mendocino* (1996) 13 Cal.4th 45 [51 Cal.Rptr.2d 837, 913 P.2d 1046], as follows:

"Although the language of California Constitution article III, section 3, may suggest a sharp demarcation between the operations of the three branches of government, California decisions long have recognized that, in reality, the separation of powers doctrine ' "does not mean that the three departments of our government are not in many respects mutually dependent" ' [citation], or that the actions of one branch may not significantly affect those of another branch. Indeed, upon brief reflection, the substantial interrelatedness of the three branches' actions is apparent and commonplace: the judiciary passes upon the constitutional validity of legislative and executive actions, the Legislature enacts statutes that govern the procedures and evidentiary rules applicable in judicial and executive proceedings, and the Governor appoints judges and participates in the legislative process through the veto power. Such interrelationship, of course, lies at the heart of the constitutional theory of 'checks and balances' that the separation of powers doctrine is intended to serve.

"At the same time, this doctrine unquestionably places limits upon the actions of each branch with respect to the other branches. The judiciary, in

---

[10]Appellant appears to argue that if the error was not made "in preparation of" the list, it is not subject to the statutory prohibition against correction. However, that position is meritless, since section 14105.98, subdivision (f)(5), states in part: "*Nothing* on a [DSH] list, once issued by the department, *shall be modified* for any reason, other than mathematical or typographical errors or omissions on the part of the department or the Office of Statewide Health Planning and Development in preparation of the list." (Italics added.)

[11]California Constitution, article III, section 3, provides: "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution."

reviewing statutes enacted by the Legislature, may not undertake to evaluate the wisdom of the policies embodied in such legislation; absent a constitutional prohibition, the choice among competing policy considerations in enacting laws is a legislative function. [Citation.] The executive branch, in expending public funds, may not disregard legislatively prescribed directives and limits pertaining to the use of such funds. [Citation.] And the Legislature may not undertake to readjudicate controversies that have been litigated in the courts and resolved by final judicial judgment. [Citations.]" (*Superior Court* v. *County of Mendocino, supra,* 13 Cal.4th at pp. 52-53 [statute declaring courts shall not be session on unpaid furlough days agreed on by any county and its employees did not violate separation of powers doctrine].)

Here, we deal with a statute enacted by the Legislature, and an administrative agency director who is part of the executive branch of government. (*California Radioactive Materials Management Forum* v. *Department of Health Services* (1993) 15 Cal.App.4th 841, 873 [19 Cal.Rptr.2d 357] [Director of Department of Health Services is executive officer].) The statute on its face prohibits the remedy sought by appellant. (§ 14105.98, subd. (f)(5) ["Nothing on a [DSH] list, once issued by the department, shall be modified for any reason, other than mathematical or typographical errors," etc.].) This language is clear and unambiguous in precluding the remedy sought by appellant, and we need not address appellant's authorities concerning principles of statutory construction, which apply when a statute is ambiguous.

Appellant contends that, if section 14105.98 precludes correction of the error in this case, that would allow the Legislature to vest the agency with uncontrolled discretion, in violation of the separation of powers doctrine. Appellant cites *Tarpey* v. *McClure* (1923) 190 Cal. 593 [213 P. 983], for the proposition that a legislative act is void as violative of the separation of powers doctrine to the extent the statute vests an agency with uncontrolled discretion.

However, we see nothing in *Tarpey* discussing the separation of powers doctrine. Moreover, section 14105.98 does not confer unfettered discretion. To the contrary, the statute limits the agency so it is without discretion to correct certain errors (like the error at issue in this case) even if it wanted to do so.

There is no issue of uncontrolled discretion in this case. Even though the trial court stated the Department's mistake did not constitute an abuse of

discretion, discretion is not really at issue at all.[12] A mistake was made. The statute precluded correction for the 1994-1995 year. The mistake went uncorrected for the 1994-1995 year (though it is agreed the Department can and will use the correct codes henceforth).

Appellant attempts to put a more favorable spin on the matter. Appellant states section 14105.98 requires that certain methodologies be used to calculate the limit on a hospital's reimbursable days. Appellant stresses it is "not challenging a permissible methodology used by the Department. Appellant is challenging an illegal methodology used by the Department - one which is not provided for in the statute or State Plan Attachment which control [sic] the methodology and determination of payment amounts to DSH hospitals." Appellant argues that since the Department used the wrong numbers in calculating DSH caps, it acted outside the law in "blatantly" failing to follow the law. Appellant argues it did not request "modification" of the DSH list but correction of an "admittedly illegal methodology [the Department] had mistakenly employed . . . ."

We reject appellant's contentions. Appellant is seeking a modification prohibited by statute.

Appellant cites an opinion of this court for the proposition that the exercise of limited legislative and judicial powers by administrative agencies does not generally offend the separation of powers doctrine, as long as the scope of the agency's powers is properly defined and limited by the Legislature and the exercise of those powers is subject to appropriate judicial review. (California Radioactive Materials Management Forum v. Department of Health Services, supra, 15 Cal.App.4th at p. 870 [Senate Rules Committee had no business attempting to force agency to have certain type of hearings, where Legislature left character of hearings to discretion of agency].)

Appellant fails to show how that principle is transgressed in this case. Appellant suggests our decision will allow the Department "to act as it pleases without regard to the statutory scheme and then claim it cannot correct such errors," that the Department will have "free reign" to violate the

---

[12]We therefore need not address appellant's argument that the trial court erred in finding the Department's refusal to correct the mistake was not arbitrary or capricious. We note appellant maintains the Department did have discretion to correct its mistake because it withdrew the list to correct an error it made with respect to another hospital. However, the Department presented evidence the error with respect to the other hospital was a correctable error. Nothing in the statute permits or requires correction of a noncorrectable error when a list is withdrawn to correct a correctable error. Nothing in the statute supports appellant's apparent position that withdrawal of a final list to correct a correctable error renders the list "unfinal."

statutory method for calculating DSH payments. Appellant thus imagines the Department will intentionally deviate from the statutory method of calculation. However, there is no hint of bad faith by the Department, and we presume good faith on the part of public officials. (Evid. Code, § 664 [presumption that official duty will be regularly performed]; *City of Banning* v. *Desert Outdoor Advertising, Inc.* (1962) 209 Cal.App.2d 152, 155 [25 Cal.Rptr. 621].) Moreover, the issue as presented in this appeal implicates only a legislative limitation on the remedy for error by the Department. Appellant fails to show that this legislative limitation on remedy rises to the level of constitutional infringement under the separation of powers doctrine.

It is for the Legislature to make public policy. (*California Radioactive Materials Management Forum* v. *Department of Health Services, supra*, 15 Cal.App.4th at p. 870.) Although we find no express declaration of intent concerning this matter in the available history of the 1991 enactments of section 14105.98 (Stats. 1991, ch. 279, pp. 1762-1779 [effective immediately as urgency legislation]; Stats. 1991, ch. 1046, pp. 4824-4845 [effective immediately as urgency legislation]), the apparent policy is that, once final, the list should not be revised by anyone because of the onerous burden in re-slicing the pie and recalculating how to redistribute among various hospitals a finite pot of money. The evidence showed correction of an error with respect to one hospital would have a domino effect, affecting all other hospitals. The system is undisputedly interrelated and complicated.

We reject appellant's assumption that it is "entitled" to the DSH payments it claims. We agree with the Court of Appeals of Texas that DSH funds "do not constitute payment for medical services rendered; they offer 'additional reimbursement' based solely on the volume of services provided to indigent patients . . . . In short, [the hospital] had no more than an expectancy of receiving additional reimbursement; any rights it had to [DHS] funds were contingent on a comparison of [the hospital's] level of services to indigent patients with that of other hospitals." (*S.C. San Antonio* v. *Dept. of Human Serv.* (1995 Tex.Ct.App.) 891 S.W.2d 773, 778.) Just as Texas law characterizes DSH payments as "additional reimbursement" (*id.* at p. 778, citing 25 Tex. Admin. Code § 29.609), California law describes DSH payments as "payment adjustments" or "additional reimbursement" distributed as a "supplement" to payments for Medi-Cal services. (§ 14105.98, subds. (a)(3), (b), (d)(1); Stats. 1991, ch. 279, § 1(f), p. 1763; Cal. Code Regs., tit. 22, § 51539, subd. (c).) Thus, although "payment adjustments" are amounts paid for hospital services provided by a DSH (§ 14105.98, subd. (a)(5)), "the payment adjustment amounts under this section shall be distributed as a supplement to" payments for Medi-Cal services. (§ 14105.98, subd. (d)(1).) The statutory scheme which made appellant eligible to receive a supplement

qualified that right (or expectancy) with the proviso that certain mistakes would go uncorrected. Thus, appellant is not being foreclosed from a remedy for denial of established rights but is only being denied a remedy for allocation of an expectancy in the form of a supplement.

It makes sense that this process be streamlined and not held up in litigious disputes. Although the statute does allow correction for typographical or mathematical errors, the Legislature could have determined these errors would be minor and/or not likely to lead to protracted litigation. It does not matter that the Department conceded the error in this case, such that protracted litigation would not occur. The point is that we see a rational policy advanced by the blanket prohibition against correction of all but typographical or mathematical errors. We disagree with appellant's suggestion that foreclosure of retrospective correction of errors after a DSH list is final will discourage private hospitals from treating low-income patients.

Appellant argues the domino effect should not be considered, because otherwise any defendant can avoid an adverse judgment by saying it already spent the money. Appellant points out we have assessed penalties against the Department in other cases without regard for the condition of its pocketbook. (*County of San Joaquin* v. *Belshé* (1995) 35 Cal.App.4th 6 [41 Cal.Rptr.2d 267] [dispute concerning cost-based reimbursement].) However, here we are not letting the Department off the hook on the basis that it already distributed the money. Rather, we are saying a streamlined process which avoids the administrative morass of recalculation and redistribution is a rational way for the state DSH program to be handled. The *San Joaquin* case did not involve the DSH program.

The statutory bar to relief in this case is no more offensive to appellant's interests than the familiar concept of remedies being barred by principles of governmental immunity. *S.C. San Antonio* v. *Dept. of Human Serv.*, *supra*, 891 S.W.2d 773, stated the doctrine of governmental immunity insulated agency action from judicial review unless a statute provided for such review, the action violated constitutional procedural due process, or the constitution waived the state's immunity from suit. (*Id.* at p. 776 [trial court had no subject matter jurisdiction to review agency decision denying reimbursement under DSH program].) Similarly in California, governmental immunity generally insulates state agencies from liability for alleged injury. (Gov. Code, § 815.) Actions seeking traditional mandamus to compel a state officer to comply with a mandatory duty to disburse funds do not invade sovereign immunity, even though they involve an incidental monetary award. (*County of Sacramento* v. *Lackner* (1979) 97 Cal.App.3d 576, 587-588 [159 Cal.Rptr. 1].) Here, however, there is no duty to disburse the funds claimed by appellant; to the contrary, the statute prevents disbursement.

We conclude plaintiff fails to show the legislative scheme violates the constitutional requirement of separation of powers.

Plaintiff argues our decision would foreclose relief even if the situation involved invidious racial discrimination. That is an issue we need not address in this case, where no claim of racial discrimination has been advanced.

### DISPOSITION

The judgment is affirmed. The Department shall recover its costs on appeal.

Puglia, P. J., and Morrison, J., concurred.