171 Cal.App.4th 1458 (2009)
FORD GREENE, Plaintiff and Appellant,
v.
MARIN COUNTY FLOOD CONTROL AND WATER CONSERVATION DISTRICT, Defendant and Respondent;
FLOOD MITIGATION LEAGUE OF ROSS VALLEY et al., Interveners and Respondents.
No. A120228.
Court of Appeals of California, First District, Division Five.
March 11, 2009.
*1462 Ford Greene, in pro. per., for Plaintiff and Appellant.
Patrick K. Faulkner, County Counsel, and Sheila Shah Lichtblau, Deputy County Counsel, for Defendant and Respondent.
Ogletree, Deakins, Nash, Smoak & Stewart and Thomas M. McInerney for Interveners and Respondents Friends of the Corte Madera Creek et al.

OPINION
DONDERO, J.[*] 
A county flood control and water conservation district held an election on whether to impose a new storm drainage fee. The election was mandated by article XIII D of the California Constitution, which was adopted by voter initiative in 1996 as Proposition 218. In the district's election, voters' names and addresses were printed on the ballots and voters were directed to sign their ballots. The fee was approved. However, a voter contested the election, claiming the election procedures violated the voting secrecy requirement of article II, section 7 of the California Constitution. The superior court denied the election contest.
This appeal requires us to construe article XIII D of the California Constitution and specifically article XIII D, section 6, subdivision (c),[1] which imposes the election requirement for certain new or increased real property fees. We conclude the voters who adopted Proposition 218 intended voting to *1463 be secret in these fee elections. We set aside the district's election results because voters' names were printed on the ballots and ballots had to be signed, yet voters were provided no assurances that their votes would be kept secret.

BACKGROUND
In 1996, voters approved Proposition 218 to close perceived loopholes in the restrictions on property taxes imposed by Proposition 13.[2] (Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles (2001) 24 Cal.4th 830, 838-839 [102 Cal.Rptr.2d 719, 14 P.3d 930] (Apartment Assn.); Howard Jarvis Taxpayers Assn. v. City of Riverside (1999) 73 Cal.App.4th 679, 681 [86 Cal.Rptr.2d 592] (Riverside).) Proposition 13 limited ad valorem property taxes to 1 percent of a property's assessed valuation, limited increases in assessed valuation to 2 percent per year unless and until the property changed hands, and "prohibited counties, cities, and special districts from enacting any special tax without a two-thirds vote of the electorate." (Riverside, at pp. 681-682; see Cal. Const., art. XIII A.[3]) In 1992, the Supreme Court held that a property assessment[4] was not a special tax within the meaning of Proposition 13. (Knox, supra, 4 Cal.4th at p. 141.) According to the proponents of Proposition 218, Knox created a loophole in Proposition 13's voter approval requirements, which local governments subsequently exploited to a degree that assessments were "`limited only by the limits of the human imagination.'"[5] (Ballot Pamp., Gen., Elec. (Nov. 5, 1996) argument in favor of Prop. 218, p. 76.)
Proposition 218 added articles XIII C and XIII D to the California Constitution. (Riverside, supra, 73 Cal.App.4th at p. 682.) Those articles "allow[] only four types of local property taxes: (1) an ad valorem property tax; (2) a special tax; (3) an assessment; and (4) a fee or charge." (Ibid.) Article XIII C imposes restrictions on general and special property taxes in *1464 addition to those imposed under article XIII A. Article XIII D restricts property assessments, and fees or charges.[6]
For new or increased property assessments, article XIII D requires agencies to obtain an engineer's report on the assessment and mail detailed notice to affected property owners, explaining the reason for and the method of calculating the assessment and identifying the amount chargeable to the owner's particular parcel. (Art. XIII D, § 4, subds. (b), (c).) The notice must provide the date, time, and place of a public hearing on the assessment, include a ballot "whereby the owner may indicate his or her name, reasonable identification of the parcel, and his or her support or opposition to the proposed assessment," and conspicuously describe the procedures for tabulation of those ballots. (Art. XIII D, § 4, subds. (c), (d).) When tabulated at the public hearing, the ballots are weighted according to the proportional financial obligation of each affected parcel. (Art. XIII D, § 4, subd. (e).) If a majority of the weighted ballots oppose the assessment, it may not be imposed. (Ibid.)
For new or increased property-related fees, the initiative also requires detailed mailed notice to affected property owners, explaining the proposed fee and announcing a public hearing. (Art. XIII D, § 6, subd. (a)(1).) However, no formal balloting is required at this stage of the process. (Ibid.) Instead, "[a]t the public hearing, the agency shall consider all protests against the proposed fee or charge. If written protests against the proposed fee or charge are presented by a majority of owners of the identified parcels, the agency shall not impose the fee or charge." (Art. XIII D, § 6, subd. (a)(2).) If a majority protest does not occur, the fee (with some exceptions not relevant here) still may not be "imposed or increased unless and until that fee or charge is submitted and approved by a majority vote of the property owners of the property subject to the fee or charge or, at the option of the agency, by a two-thirds vote of the electorate residing in the affected area." (Art. XIII D, § 6, subd. (c) (section 6(c)).) Critical to the issues raised in this appeal, the initiative provides: "An agency may adopt procedures similar to those for increases in assessments in the conduct of elections under this subdivision." (Ibid.)
In July 1997, the Legislature enacted the Proposition 218 Omnibus Implementation Act. (Stats. 1997, ch. 38.) The act prescribes detailed procedures for the imposition or increase of assessments. (Gov. Code, § 53753, enacted by Stats. 1997, ch. 38, § 5, as amended by Stats. 2000, ch. 220, § 1, as amended by Stats. 2001, ch. 636, § 1, as amended by Stats. 2007, ch. 670, *1465 § 113.) These procedures require "assessment ballots" to be signed. (Gov. Code, § 53753, subd. (c).) The ballot must be "in a form that conceals its contents once it is sealed by the person submitting the assessment ballot" and, once received by the agency, must "remain sealed until the tabulation of ballots . . . commences." (Ibid.) However, during and after the tabulation, the ballots are "disclosable public records . . . equally available for inspection by the proponents and the opponents of the proposed assessment." (Gov. Code, § 53753, subd. (e)(1).) Finally, the statute expressly provides that the tabulation of assessment ballots (described in § 53753, subd. (e)) "shall not constitute an election or voting for purposes of Article II of the California Constitution or of the California Elections Code." (Id., subd. (e)(4).) The implementation legislation does not prescribe detailed procedures for fee elections under article XIII D, section 6(c). Significantly, this 1997 act does not expressly prescribe detailed procedures for fee elections under article XIII D, section 6(c).

Marin County Storm Drainage Fee
In 2007, the Marin County Flood Control and Water Conservation District (District) proposed a new storm drainage fee to be imposed on the owners of property within zone 9 (Ross Valley) of the district, which includes the communities of Greenbrae, Larkspur, Corte Madera, Kentfield, Ross, San Anselmo, and Fairfax. The purpose of the fee was to partially fund a flood protection plan, which involved the removal of constrictions in creeks that drain water from the area and the addition of detention basins upstream from those creeks to hold back or slowly release water. The area had a 50-year history of chronic flooding, which included a flood on or about December 31, 2005, that displaced residents, closed down businesses, and caused an estimated $100 million in property damage. The flood protection plan and proposed fee were developed after months of collaboration among municipalities, government agencies, and community organizations. Interveners Flood Mitigation League of Ross Valley and Friends of the Corte Madera Creek Watershed participated in this process.[7]
In February 2007, the District's director recommended a drainage system fee methodology. The District's board of supervisors (Board) approved the methodology and directed preparation of an engineering report, which was *1466 completed in March. Legal counsel for the District drafted procedures for mailed notice, conduct of a public hearing, and tabulation of written protests at that hearing (Written Protest Procedures). The Written Protest Procedures stated they were adopted "for the purposes of assuring compliance with the requirements of Section 6" of article XIII D.
On the director's recommendation, the Board accepted the final engineer's report, adopted the Written Protest Procedures, scheduled a public hearing on the fee for May 1, 2007, and directed the mailing of notices to affected property owners. On May 1, the Board declared by resolution that there was no majority protest at the public hearing and it called a "special election" on the fee "to be held on Monday, June 25, 2007, solely by mailed ballot, pursuant to and in accordance with Section 6 and the procedures . . . attached hereto." Those procedures (Election Procedures) provided that the "mail ballot election shall constitute an election for the purposes of Section 6 of Article [XIII D] of the California Constitution . . . [and shall] be conducted in substantial compliance with the requirements of the California Elections Code to the extent feasible, and otherwise in accordance with these procedures." The procedures designated the clerk and deputy clerk or clerks to conduct the election, who would be the only persons to have access to the ballots, and prohibited them from disclosing any individual's vote absent a court order. The procedures required ballots to be signed and specified that unsigned ballots would not be counted.
The ballots actually mailed to voters were pieces of card stock printed on both sides. One side provided voting instructions (instruction side) and the other was used for the actual voting (voting side). The instruction side directed the recipient to follow four steps in order to vote on the proposed fee: 1. Read the enclosed information about the proposed fee; 2. Check yes or no on the voting side of the ballot; 3. Sign your name and write the date, in ink; and 4. Return the ballot to a specified address by June 25, 2007. The voting side of the ballot was printed with the address of a specific parcel, the amount of the fee that would be charged to that parcel if the fee was approved, and the name and address of the record property owner. It set forth the issue to be voted on, i.e., whether the district should impose the specified fee, briefly described how the fee would be used, and provided check boxes for voters to vote yes or no on the question. Finally, the voting side of the ballot provided a space for the voter to print his or her name and date and sign the ballot over text declaring under penalty of perjury that he or she was authorized to vote on behalf of the identified parcel. The ballots apparently were mailed with an unaddressed return envelope that stated prominently on its face, "OFFICIAL PROPERTY OWNER BALLOT INSIDE."
*1467 The official canvass of the votes was 8,059 total ballots cast; 3,208 yes votes; 3,143 no votes; 1,708 invalidated votes. On July 10, 2007, the Board declared that the measure passed. On July 17, 2007, the Board implemented the fee.

Election Contest
On July 16, 2007, "Ford" Greene (Greene), a property owner affected by the fee who voted in the election, demanded a recount of the election results pursuant to Elections Code section 15620. The record does not include any written response to the recount demand or any official declaration of the results of a recount. (See Elec. Code, § 15633 [requiring recount results to "be posted conspicuously in the office of the elections official"].)
On August 9, 2007, Greene filed a "Verified Complaint for an Election Contest" pursuant to Elections Code section 16100 et seq.[8] The District answered and pursuant to the trial court's authorization, Flood Mitigation League of Ross Valley and Friends of the Corte Madera Creek Watershed filed their complaint in intervention, joining the District in opposing appellant's election contest complaint.
As relevant to this appeal, Greene argued that requiring voters to sign their ballots violated article II, section 7, which requires that voting be conducted secretly, and that the form of the ballot violated Elections Code requirements for voting by mail. The District and Interveners responded that neither article II nor the Elections Code applied to a property fee election conducted under article XIII D, section 6(c) because section 6(c) "specifically allows for property fee elections to mirror the requirements set forth for the conduct of elections in assessment fees." They argued the District's fee election complied with Government Code section 53753's assessment balloting procedures.
The trial court denied the election contest. It ruled that the election ballot complied with both article XIII D and Government Code section 53753, which required ballots to be signed. The court wrote, "Plaintiff's reliance on California Const. Art. II, § 7, and the Election[s] Code requirements for ballots in other types of elections, is misplaced." In doing so, it cited Government Code section 53753, subdivision (e)(4), which provides that those laws do not apply to assessment balloting.

*1468 DISCUSSION
(1) The California Supreme Court has declared that the "`right to a secret ballot . . . is the very foundation of our election system.'" (Scott v. Kenyon (1940) 16 Cal.2d 197, 201 [105 P.2d 291] (Scott).) It is the "right to vote one's conscience without fear of retaliation." (McIntyre v. Ohio Elections Comm'n (1995) 514 U.S. 334, 343 [131 L.Ed.2d 426, 115 S.Ct. 1511]; see Burson v. Freeman (1992) 504 U.S. 191, 200-207 [119 L.Ed.2d 5, 112 S.Ct. 1846] (plur. opn. of Blackmun, J.) (Burson) [describing problems of intimidation and electoral fraud that led to adoption of secret ballot by all 50 states].) The right is "an important and valuable safeguard for the protection of the voter, and particularly the humble citizen, against the influence which wealth and situation may be supposed to exercise." (Robinson v. McAbee (1923) 64 Cal.App. 709, 714 [222 P. 871] (Robinson).) The right to secrecy encompasses not only the right to cast one's vote in private (Peterson v. City of San Diego (1983) 34 Cal.3d 225, 230 [193 Cal.Rptr. 533, 666 P.2d 975]; Wilks v. Mouton (1986) 42 Cal.3d 400, 408 [229 Cal.Rptr. 1, 722 P.2d 187], superseded by statute on other grounds as stated in Escalante v. City of Hermosa Beach (1987) 195 Cal.App.3d 1009, 1019 [241 Cal.Rptr. 199]; Scott, at p. 201), but also the right to maintain the confidentiality of one's vote following an election (Scott, at pp. 201, 203; Patterson v. Hanley (1902) 136 Cal. 265, 269-270 [68 P. 821]; Robinson, at p. 714).
At issue here is whether the right to secrecy in voting applies to an "election" to approve a property-related fee conducted pursuant to article XIII D, section 6(c). More specifically, by passing Proposition 218 and therefore voting to require an "election" before agencies could impose certain types of property-related feeswith the important qualification that the agencies could use procedures similar to those for increases in assessmentsdid the electorate intend that voting would be secret? For the reasons discussed below, we conclude they did. After explaining the basis for this conclusion, we turn to the question whether judgment should have been granted in the District's favor on Greene's election contest.

I. Standard of Review

The scope of our review in an election contest is no different from that in other appeals: we review factual findings for substantial evidence and questions of law de novo. (Gooch v. Hendrix (1993) 5 Cal.4th 266, 278-279 [19 Cal.Rptr.2d 712, 851 P.2d 1321] (Gooch).) The trial court determined that the election contest raised pure questions of law and decided the case based on briefing and argument without holding an evidentiary hearing. Therefore, our review is de novo. (Ghirardo v. Antonioli (1994) 8 Cal.4th 791, 799-800 [35 Cal.Rptr.2d 418, 883 P.2d 960]; see also Apartment Assn., supra, 24 Cal.4th at p. 836 [interpretation of art. XIII D is question of law].)

*1469 II. Article XIII D, Section 6(c) Requires Secret Voting

(2) In construing Proposition 218, "we apply the familiar principles of constitutional interpretation, the aim of which is to `determine and effectuate the intent of those who enacted the constitutional provision at issue.' [Citation.] `The principles of constitutional interpretation are similar to those governing statutory construction.' [Citation.] If the language is clear and unambiguous, the plain meaning governs. [Citation.] But if the language is ambiguous, we consider extrinsic evidence . . . . [Citations.]" (Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority (2008) 44 Cal.4th 431, 444-445 [79 Cal.Rptr.3d 312, 187 P.3d 37] (Silicon Valley).) "To decipher the purpose of an ambiguous statute, a court may consider the ostensible objects to be achieved by the statute, the statutory scheme of which the statute is a part, the evils to be remedied, public policy, the legislative history, and the wider historical circumstances of the enactment. [Citations.]" (AB Cellular LA, LLC v. City of Los Angeles (2007) 150 Cal.App.4th 747, 758-759 [59 Cal.Rptr.3d 295].)

A. Plain Language of Article XIII D, Section 6(c)

(3) As summarized above, article XIII D, section 6 prescribes a two-step process for approval of a property-related fee: (1) a noticed public hearing at which affected property owners may submit written protests, and if no majority protest occurs at that hearing, (2) an "election" on the fee. At issue here is the second requirement. Specifically, did the voters intend by the following relevant language that voting on the fee be secret? "Voter Approval for New or Increased Fees and Charges. [With exceptions not relevant here], no property related fee or charge shall be imposed or increased unless and until that fee or charge is submitted and approved by a majority vote of the property owners of the property subject to the fee or charge or, at the option of the agency, by a two-thirds vote of the electorate residing in the affected area. The election shall be conducted not less than 45 days after the public hearing. An agency may adopt procedures similar to those for increases in assessments in the conduct of elections under this subdivision." (Art. XIII D, § 6(c), italics added.)

1. "Election," "Majority Vote," and "Voter Approval"

The plain language of article XIII D, section 6(c) is silent on the issue of whether voting in an election under that subdivision must be secret. However, section 6(c) uses the terms "voter approval," "majority vote," "vote of the electorate," "election," and "elections." By way of comparison, article XIII D, section 6, subdivision (a), which sets forth the requirements for majority protest proceedings on a proposed fee (which is the only voter approval *1470 requirement for sewer, water, and refuge collection fees, and is the first phase of voter approval for other property-related fees), does not use any of these terms. Other provisions of Proposition 218 use "election" and "vote" to refer to votes by the general electorate that presumably are governed by article II. (Art. XIII C, § 2, subds. (b), (c), (d); see Bighorn, supra, 39 Cal.4th at pp. 213-214 ["[W]hen a word has been used in different parts of a single enactment, courts normally infer that the word was intended to have the same meaning throughout."].) Similarly, Proposition 13, the predecessor of Proposition 218, uses the word "election" in that sense. (Art. XIII A, § 4; see Apartment Assn., supra, 24 Cal.4th at pp. 838-839 ["Proposition 218 is Proposition 13's progeny . . . [and] must be construed in that context."].) Arguably when used in the context of real property taxation elections, the terms "vote" and "election" suggest a secret ballot election of the sort used to elect candidates or pass initiatives.
On the other hand, article XIII D, section 6(c) includes a significant express qualification on the terms "vote" and "election." It provides, "An agency may adopt procedures similar to those for increases in assessments in the conduct of elections under this subdivision." (Art. XIII D, § 6(c).) Our interpretation of this qualifying statement entails three subsidiary inquiries. First, what is meant by the "procedures . . . for increases in assessments"? Second, what is meant by "similar to"? Third, what is the significance of the fact that the qualifying statement applies to "the conduct of elections under this subdivision"? (Ibid., italics added.)

2. "Procedures . . . for Increases in Assessments"

The District argues that "procedures . . . for increases in assessments" encompass the specific procedures that were adopted by the Legislature after Proposition 218 passed to implement the initiative, specifically Government Code section 53753. However, the voters could not have intended to approve procedures that did not exist at the time they approved the initiative. Nor can "procedures . . . for increases in assessments" reasonably be read as a reference to statutory procedures that were in effect at the time Proposition 218 was adopted. The initiative imposed new procedural requirements on increases in assessments, which were clearly intended to supersede the existing statutory procedures.
We conclude, therefore, that "procedures . . . for increases in assessments" must mean the assessment procedures that are imposed by Proposition 218 itself. Article XIII D, section 4, subdivisions (c) to (e) sets forth those procedures. Section 4 does not use the terms "election" or "vote." It does refer to "ballots": it requires a "ballot" to be sent to the property owners who will be affected by a proposed assessment, along with a conspicuous notice of *1471 the procedures applicable to the "completion, return, and tabulation of the ballots" and a disclosure that "a majority protest, as defined in subdivision (e), will result in the assessment not being imposed." (Art. XIII D, § 4, subd. (c), italics added.) Majority protest is defined as "ballots submitted in opposition to the assessment exceed the ballots submitted in favor of the assessment." (Art. XIII D, § 4, subd. (e), italics added.)[9]
These balloting requirements are silent as to whether the balloting must or may be secret. Several of the requirements suggest a nonsecret vote. The ballot must be one "whereby the owner may indicate his or her name, reasonable identification of the parcel, and his or her support or opposition to the proposed assessment,"[10] which suggests that these three pieces of information will appear on a single piece of paper in contrast to the typical election ballot that does not identify the voter. (Art. XIII D, § 4, subd. (d).) The ballots must be tabulated "[a]t the public hearing," which suggests the information on the ballot might become public at the hearing. (Art. XIII D, § 4, subd. (e).) Finally, ballots must be "weighted according to the proportional financial obligation of the affected property," which requires the person actually tabulating the ballots to take the identity of the parcel (and thus of the property owner) into account, again suggesting a nonsecret procedure. (Ibid.)
On the other hand, an agency could comply with article XIII D, section 4 while maintaining secrecy in voting. The information on the ballot need not be publicly disclosed at the public hearing. The persons tabulating the ballots could use the information on the ballot (even if all gathered on a single piece of paper) to validate, weight, and count the ballots but keep the information confidential in the absence of a challenge to the balloting resulting in a court *1472 disclosure order. Indeed, this was the procedure prescribed for the District's fee election under the Election Procedures.[11]
Alternatively, the voter and parcel identifying information could be placed on the outside of an envelope that contains the ballot, in the manner of absentee voting. (See Elec. Code, §§ 3010-3011.) The voter's qualification could then be confirmed and the weight to be accorded the ballot calculated before the ballot was opened. There would need to be a mechanism to associate the actual vote with the weight of the ballot, but this could be done using computer coding to avoid public disclosure of any individual property owner's vote (i.e., the association of a particular voter to a particular vote would be hidden within the computer databank unless ordered disclosed on a challenge to the balloting) or by some other mechanism strictly limiting the disclosure of information that would link the identity of a voter to a yes or no vote.
(4) In sum, we conclude that the phrase "procedures . . . for increases in assessments" in article XIII D, section 6(c) are the procedures described in article XIII D, section 4, subdivisions (c) to (e). Those procedures in some ways suggest a nonsecret process, but they may also be followed while maintaining secrecy in voting. Therefore, this particular phrase does not clarify whether voting in a section 6(c) fee election must be secret.[12]

3. "Similar to"

The qualifying statement in article XIII D, section 6(c) authorizes the use of procedures "similar to," not "the same as," assessment balloting procedures. (Art. XIII D, § 6(c).) This language introduces additional ambiguity into the provision. If "similar to" encompasses "the same as," the provision authorizes the use of procedures that comply with article XIII D, section 4, *1473 subdivisions (c) to (e) without qualification. "Similar to," however, might indicate that agencies may use such procedures only if they do not conflict with the "election" requirement. For example, the provision might authorize the use of the mail balloting and vote weighting procedures that appear in section 4 without also authorizing nonsecret voting (assuming for purposes of argument that section 4 authorizes nonsecret voting). The "similar to" phrase is ambiguous in this respect.

4. "Conduct of Elections under this Subdivision"

The qualifying statement authorizes the use of procedures similar to those for increases in assessments in the "conduct of elections under this subdivision." (Art. XIII D, § 6(c), italics added.) Article XIII D, section 6(c) describes two types of elections: "a majority vote of the property owners of the property subject to the fee or charge or, at the option of the agency, . . . a two-thirds vote of the electorate residing in the affected area." (Ibid., italics added.) If we construe "similar to" to authorize an agency to conduct a section 6(c) election using the procedures for increases in assessments in article XIII D, section 4, and if we conclude those procedures do not include a secret vote, section 6(c) would appear to authorize an agency to conduct a general vote of the electorate in that manner. This startling consequence strongly suggests that "similar to" in the qualifying statement of section 6(c) only authorizes the use of the section 4 assessment balloting procedures if the procedures are compatible with the "election" requirement.

5. The Article XIII D, Section 6(c) "Election" Requirement is Ambiguous

(5) In sum, it is unclear from the language of article XIII D, section 6(c) whether the fee election required by that subdivision may be conducted without ensuring secrecy in voting. The initiative's use of the term "elections" and "vote" strongly suggest a secret ballot procedure. Although the "election" requirement is expressly qualified by a provision authorizing the use of "procedures similar to those for increases in assessments," those procedures (set forth in art. XIII D, § 4, subds. (c)-(e)) do not clearly permit nonsecret voting. Even if they did, section 6(c) only authorizes procedures "similar to" the assessment balloting procedures and it requires the agency to conduct "elections." The qualifying statement could reasonably be construed to authorize mail balloting (for any fee election) and vote weighting (for fee elections restricted to property owners) without authorizing nonsecret voting.
Because the meaning of the article XIII D, section 6(c) "election" requirement is ambiguous, we turn to principles of constitutional construction and extrinsic aids to resolve the ambiguity. (See City and County of San *1474 Francisco v. County of San Mateo (1995) 10 Cal.4th 554, 562-563 [41 Cal.Rptr.2d 888, 896 P.2d 181]; Silicon Valley, supra, 44 Cal.4th at pp. 444-445.) We consider the coequal constitutional secret voting requirement and whether and how it should be harmonized with article XIII D, section 6(c); the initiative's language indicating its proper construction; the ballot pamphlet as evidence of voter intent; the historical context of Proposition 218 (i.e., existing assessment approval practices at the time voters adopted the initiative); and the significance of the Proposition 218 implementing legislation, including Government Code section 53753.

B. Construing Article XIII D, Section 6(c) in Light of Article II, Section 7

(6) Discussing the interpretation of a constitutional provision, the Supreme Court has explained: "It is a cardinal rule of construction that words or phrases are not to be viewed in isolation; instead, each is to be read in the context of the other provisions of the Constitution bearing on the same subject. [Citation.] The goal, of course, is to harmonize all related provisions if it is reasonably possible to do so without distorting their apparent meaning, and in so doing to give effect to the scheme as a whole. [Citations.]" (Fields v. Eu (1976) 18 Cal.3d 322, 328 [134 Cal.Rptr. 367, 556 P.2d 729]; see also Serrano v. Priest (1971) 5 Cal.3d 584, 596 [96 Cal.Rptr. 601, 487 P.2d 1241] ["where constitutional provisions can reasonably be construed to avoid a conflict, such an interpretation should be adopted"]; Board of Supervisors v. Lonergan (1980) 27 Cal.3d 855, 866 [167 Cal.Rptr. 820, 616 P.2d 802] ["It is well settled that a constitutional amendment is to be construed in harmony with the existing framework of which it forms a part, so as to avoid a conflict."].)
A coequal article of the California Constitution, which governs voting and elections, provides, "Voting shall be secret." (Art. II, § 7.) "Voting" is not qualified in article II, section 7 to make it inapplicable to a fee election, and "election" and "vote" are not qualified in article XIII D, section 6(c) to make article II, section 7 inapplicable. On their face, therefore, article XIII D, section 6(c) and article II, section 7 are most easily harmonized by construing the "election" required by article XIII D, section 6(c) to be a secret-ballot election.
The District observes that the Supreme Court held long ago that article II does not apply to assessment elections. However, the rationale of those cases has been undermined by the passage of Proposition 218 itself, as the Supreme Court recently acknowledged in Silicon Valley, supra, 44 Cal.4th 431.

*1475 1. Imposition of Fees and Assessments on Real Property before Silicon Valley

Before the passage of Proposition 218, no election or other form of voter approval was constitutionally required before an assessment or fee could be imposed on property owners. Due process required only that property owners be given notice and an opportunity to be heard on two issues: whether the land included within an assessment district would be benefited by the proposed improvements (the substantive basis for the assessment), and whether the assessment imposed on an individual property owner was accurately determined. (See Fallbrook Irrigation District v. Bradley (1896) 164 U.S. 112, 167, 174-175 [41 L.Ed. 369, 17 S.Ct. 56]; In re Orosi Public Utility Dist. (1925) 196 Cal. 43, 50-51 [235 P. 1004].)
When the Legislature chose to require voter approval, the Legislature determined how the voting or taxpayer approval would be conducted. State constitutional provisions governing elections, including the provision requiring voting to be secret, did not apply. (Tarpey v. McClure (1923) 190 Cal. 593, 606 [213 P. 983] (Tarpey) [citing cases].)[13] "[T]he state could accomplish this very work without organizing a district as such at all, and without giving the landowners within the district any voice in the selection of the managers or trustees. . . . It is in accord with the progressive spirit of our government to give to the people, or any part of them, the largest possible control in matters peculiarly affecting them and their interests. It is a concession to this spirit, and not the compulsion of the law, which prompts the legislature to give the landowners so large a voice in the management of these affairs." (People v. Sacramento Drainage Dist. (1909) 155 Cal. 373, 382 [103 P. 207] (Drainage Dist.) [rejecting argument that former art. I, § 11, and former art. IV, § 25 (predecessor of current art. IV, § 16), prohibiting certain special laws, applied to assessment election]; id. at pp. 381-382; see Potter v. Santa Barbara (1911) 160 Cal. 349, 355-356 [116 P. 1101] (Potter) [following Drainage Dist. and rejecting argument that former art. I, § 24 (predecessor of current art. I, § 22), which prohibited property qualification for right to vote, applied to assessment elections]; see Tarpey, at p. 606 [following Potter and rejecting argument that constitutional secret voting requirement applied to assessment elections].)
*1476 In Alden v. Superior Court, for example, the court considered whether an election on the formation of a water district (a type of assessment district) was invalid because the paper used for the ballots was so thin that the votes were not kept secret. (Alden v. Superior Court (1963) 212 Cal.App.2d 764, 766-767 [28 Cal.Rptr. 387].) The court held the constitutional requirement for secrecy in voting did not apply. "The creation of such a district is a legislative act, and the Legislature may enact conditions, upon the performance of which the district shall be regarded as organized. (Tarpey[, supra, 190 Cal. at p. 600].) The constitutional provisions which govern elections held in the ordinary course of civil government do not control such formation elections." (Alden, at p. 770.)
Before the adoption of Proposition 218, the courts also held that legislative determinations on the substantive standards for assessments (i.e., whether the assessment would benefit the affected land) were subject only to very narrow judicial review. In so ruling, the courts relied on a similar rationale: "[T]he establishment of a special assessment district takes place as a result of a peculiarly legislative process grounded in the taxing power of the sovereign.. . . The scope of judicial review of such actions is accordingly quite narrow." (Dawson v. Town of Los Altos Hills (1976) 16 Cal.3d 676, 683-684 [129 Cal.Rptr. 97, 547 P.2d 1377], italics added (Dawson); see also Knox, supra, 4 Cal.4th at p. 147.)

2. Silicon Valley Changes the Landscape

In Silicon Valley, the California Supreme Court held that the passage of Proposition 218 undermined the legislative-function rationale for the deferential standard of review on the substantive requirements for assessments. (Silicon Valley, supra, 44 Cal.4th at pp. 450-451.) "Before Proposition 218 became law, special assessment laws were generally statutory, and the constitutional separation of powers doctrine served as a foundation for a more deferential standard of review by the courts. But after Proposition 218 passed, an assessment's validity, including the substantive requirements, is now a constitutional question. `There is a clear limitation . . . upon the power of the Legislature to regulate the exercise of a constitutional right.' [Citation.]" (Silicon Valley, supra, 44 Cal.4th at p. 448.) The court concluded that an agency's determination whether an assessment met the substantive requirements of article XIII D, section 4 is subject to independent rather than deferential judicial review. (44 Cal.4th at p. 450.)
While the specific holding of Silicon Valley, supra, 44 Cal.4th 431 is not directly relevant to this appeal, the court's analysis provides a template for ours. The Tarpey line of cases held that former article II, section 5 (now art. II, § 7) and other constitutional provisions governing elections were inapplicable *1477 to assessment elections because voter approval procedures for assessments were matters of legislative discretion and were not constitutionally compelled. (See Tarpey, supra, 190 Cal. at p. 606.) Under Proposition 218, however, voter approval procedures for assessments and fees now have constitutional status. (Art. XIII D.) The Legislature is no longer free to impose an assessment "without organizing a district as such at all, and without giving the landowners within the district any voice in the selection of the managers or trustees." (Drainage Dist., supra, 155 Cal. at p. 382.) An election now takes place not because of the progressive spirit of the Legislature, but due to the "compulsion of the law." (Ibid.) Therefore, the rationale of the pre-Proposition 218 cases no longer applies.
The District argues that Proposition 218 adopted the Tarpey approach and thus confirms that assessment balloting and fee elections are different from ordinary elections and fall outside the scope of constitutional provisions such as article I, section 22, and article II, section 7. The District specifically relies on article XIII D's requirement that assessment balloting (and authorization that fee elections) be limited to property owners, which ordinarily would violate article I, section 22. (See Potter, supra, 160 Cal. at p. 355 [approving property qualification despite constitutional prohibition]; Tarpey, supra, 190 Cal. at p. 606 [same].) These express article XIII D provisions limiting balloting or voting to property owners, however, expressly provide that article I, section 22 does not apply to article XIII D assessment balloting or fee elections despite the new constitutional status of the ballot and election requirements. Article XIII D is silent as to voting secrecy. Thus, the constitutional "election" requirement in article XIII D, section 6(c) is unqualified as far as voting secrecy is concerned. The Tarpey line of cases is irrelevant: the cases shed no light on whether nonsecret voting is constitutionally permissible in the new post-Proposition 218 context of constitutional voter approval requirements, just as the Dawson and Knox cases are no longer helpful in determining the appropriate standard of review on the substantive standard for assessments under Proposition 218. (See Silicon Valley, supra, 44 Cal.4th at p. 450.)
(7) We conclude that article XIII D, section 6(c) and article II, section 7 are best harmonized by construing "election" in article XIII D, section 6(c) as a secret ballot election.

C. Liberal Construction to Further the Purposes of Proposition 218

(8) Proposition 218 itself provides guidance for our construction of ambiguous provisions of the initiative. Section 5 (an uncodified section of the initiative measure) provides, "The provisions of this act shall be liberally *1478 construed to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent." (Ballot Pamp., Gen. Elec., supra, text of Prop. 218, § 5, p. 109; see Silicon Valley, supra, 44 Cal.4th at p. 448 [relying in part on Prop. 218, § 5 for guidance in construing art. XIII D].) Section 2 (also uncodified) elaborates on the measure's purpose: "The people of the State of California hereby find and declare that Proposition 13 was intended to provide effective tax relief and to require voter approval of tax increases. However, local governments have subjected taxpayers to excessive tax, assessment, fee and charge increases that not only frustrate the purposes of voter approval for tax increases, but also threaten the economic security of all Californians and the California economy itself. This measure protects taxpayers by limiting the methods by which local governments exact revenue from taxpayers without their consent." (Ballot Pamp., Gen. Elec., supra, text of Prop. 218, § 2, p. 108; see Silicon Valley, at p. 446 [relying in part on Prop. 218, § 2 ("Proposition 218's preamble") for guidance in construing art. XIII D].)
As rephrased by the Supreme Court, "Proposition 218 was designed to: constrain local governments' ability to impose assessments; place extensive requirements on local governments charging assessments; . . . and limit the methods by which local governments exact revenue from taxpayers without their consent. . . . Proposition 218's underlying purpose was to limit government's power to exact revenue and to curtail the deference that had been traditionally accorded legislative enactments on fees, assessments, and charges . . . ." (Silicon Valley, supra, 44 Cal.4th at p. 448; see also Richmond v. Shasta Community Services Dist. (2004) 32 Cal.4th 409, 420 [9 Cal.Rptr.3d 121, 83 P.3d 518] ["[T]he aim of Proposition 218 [is] to enhance taxpayer consent."].)
Requiring secret voting furthers Proposition 218's twin purposes of limiting the government's power to exact revenue and to enhance taxpayer consent. In an article XIII D, section 6(c) fee election, the agency conducting the election is a proponent of the proposed fee. Conflict is not unlikely between public officials' desire to finance costly services and taxpayers' resistance to the financial burden of such fees. (See Ventura Group Ventures, Inc. v. Ventura Port Dist. (2001) 24 Cal.4th 1089, 1103 [104 Cal.Rptr.2d 53, 16 P.3d 717] ["Proposition 13 put local government on a strict budget and thus required it to make painful choices."]; Apartment Assn., supra, 24 Cal.4th at pp. 838-839 ["Proposition 218 is Proposition 13's progeny . . . [and] must be construed in that context."].) Secrecy in voting enhances free taxpayer consent to approve or reject a proposed fee in the face of local controversy about its merits and it makes it more difficult for government to extract revenue from unwilling taxpayers. Therefore, in liberally construing Proposition 218 to further its purposes, we construe the terms "election" and "voting" to mean secret voting.

*1479 D. Ballot Pamphlet

(9) If the words of a constitutional provision are ambiguous, we may consult the provision's legislative history for evidence of the enacting party's intent, which in the case of a voter initiative is the ballot pamphlet. (Silicon Valley, supra, 44 Cal.4th at pp. 444-445; City and County of San Francisco v. County of San Mateo, supra, 10 Cal.4th at p. 563; Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization (1978) 22 Cal.3d 208, 245-246 [149 Cal.Rptr. 239, 583 P.2d 1281] (Amador Valley).)
In the ballot pamphlet for Proposition 218, both the Legislative Analyst's analysis and the ballot arguments communicated to voters that the initiative implicated their voting rights and there was no indication that the right to a secret ballot would be impaired.
The Legislative Analyst's analysis of the initiative used the words "election" and "vote" for both the assessment balloting procedure prescribed by article XIII D, section 4, and for the fee election required by article XIII D, section 6(c). (Ballot Pamp., Gen. Elec., supra, analysis of Prop. 218 by the Legislative Analyst, pp. 73-74.) In contrast to existing law, which "generally require[d] local governments to reject a proposed assessment if more than 50 percent of the property owners protest[ed] in writing," Proposition 218 would require local governments to "hold a mail-in election for each assessment. Only property owners and any renters responsible for paying assessments would be eligible to vote. Ballots cast in these elections would be weighted . . . ." (Ballot Pamp., at pp. 73-74, italics added.) On fees, the issue directly relevant here, the analyst wrote that under Proposition 218 local governments would first have to "mail information about the fee to every property owner, reject the fee if a majority of the property owners protest in writing" and, if not, "hold an election on the fee . . . ." (Ballot Pamp., at p. 73, italics added.) In sum, the Legislative Analyst contrasted "written protest" procedures, which were applicable to assessments before Proposition 218 and that would be applicable to initial fee approval under Proposition 218, to the "election" and voting that would be required for final approval of assessments and fees (with some exceptions) under the initiative. That is, the initiative would establish taxpayer voting rights with respect to assessments as well as fees.[14]
The overwhelming focus of the arguments in support of and in opposition to the initiative was also on the issue of voting rights. Proponents of the measure argued that the initiative would "guarantee[] your right to vote on *1480 local tax increaseseven when they are called something else, like `assessments' or `fees' . . . ." (Ballot Pamp., Gen. Elec., supra, argument in favor of Prop. 218, p. 76.) After describing how local politicians had used assessments to create loopholes in Proposition 13's requirement of voter approval for taxes, the proponents argued, "TAXPAYERS HAVE NO RIGHT TO VOTE ON THESE TAX INCREASES AND OTHERS LIKE THEM [i.e., assessments] UNLESS PROPOSITION 218 PASSES!" (Ballot Pamp., at p. 76.) The proponents repeatedly argued that the initiative "gives taxpayers the right to vote on taxes." (Id. at p. 77.) Opponents of the measure also focused on voting rights, but alleged that those rights would be infringed because of the property qualification for voting on assessments and the weighting of assessment ballots. The opponents did not suggest that voting rights would be further infringed by the absence of a secret ballot. Neither did the proponents. Voters reading these ballot arguments would reasonably conclude that "voting rights" were at issue and that those rights arguably were infringed by limiting one's voting rights according to property qualifications and weighted ballots. In other respects, however, voting rights were preserved or enhanced.
In sum, the ballot pamphlet strongly suggested to voters that the impact of Proposition 218 was to enhance the voting power of taxpayers, with the sole qualification that votes on property assessments and fees could be limited to property owners and weighted by the impact of the exaction on each individual voter. The pamphlet gave no indication that the right to a secret ballot would be infringed and consequently suggested it would be preserved. The ballot pamphlet, therefore, supports a construction of article XIII D, section 6(c) to require secret voting.

E. Proposition 218 Implementation Legislation

(10) Generally, legislative implementation of constitutional amendments adopted by initiative are traditionally accorded considerable weight by courts construing the amendments. (Methodist Hosp. of Sacramento v. Saylor (1971) 5 Cal.3d 685, 693 [97 Cal.Rptr. 1,488 P.2d 161]; Delaney v. Lowery (1944) 25 Cal.2d 561, 568-569 [154 P.2d 674].)[15] Yet a cornerstone of this deference is evidence that the construction by the Legislature is "contemporaneous" with the initiative. (Amador Valley, supra, 22 Cal.3d at pp. 245-246 [citing cases].)
(11) Significantly, the passage of Proposition 218 entrusts to the courts heightened obligations to assess whether a "local agency acting in a legislative capacity . . . exercise[s] its discretion in a way that violates constitutional *1481 provisions or undermines their effect." (Silicon Valley, supra, 44 Cal.4th at p. 448, italics added.) Since Silicon Valley, courts cannot "`"`"lightly disregard"'"'" this "`"`"clear constitutional mandate."'"'" (Ibid.) Therefore, Proposition 218 and the lead case evaluating it, Silicon Valley, present a fundamental shift in the role of courts vis-à-vis real property fees passed by local government.
With these principles in mind, we now review the Proposition 218 Omnibus Implementation Act (Act) and the District's analysis of its impact. The District argues that the Legislature interpreted article XIII D, section 6(c) not to require secret voting when it enacted and subsequently amended Government Code section 53753 as part of the Act. (Legis. Counsel's Digest, Stats. 1997, ch. 38, § 1.) We disagree. Government Code section 53753 addresses only assessment procedures, not fee elections under article XIII D, section 6(c), and the Act otherwise is either silent on the conduct of such elections or it suggests they should be conducted with secret voting.
As relevant here, the Act amended section 4000 of the Elections Code and added two articles to the Government Code: article 4.3 (§ 53739), and article 4.6 (§§ 53750, 53753 & 53753.5). (Stats. 1997, ch. 38, §§ 2, 4, 5.) Effective January 1, 2008, a new section was added to Government Code article 4.6 (§ 53755).
Government Code section 53750 defines many terms "[f]or purposes of Article XIIIC and Article XIIID of the California Constitution and this article [4.6]." (Gov. Code, § 53750.) The statute refers to taxes, assessments, and fees. (Ibid.) Some of its subdivisions are expressly applicable to taxes and fees (id., subds. (e), (h)(2)), some to taxes, assessments, and fees (id., subd. (h)(1), (3)), and some to assessments and fees (id., subds. (g), (i)). All three subdivisions of Government Code section 53739 expressly apply to taxes, assessments, and fees. (Gov. Code, § 53739, subds. (a), (b)(1), (2).)
In contrast, Government Code sections 53753 and 53753.5, which address the notice, protest, and hearing requirements for assessments under article XIII D, section 4, expressly apply only to assessments. (Gov. Code, §§ 53753, 53753.5.) They do not refer to fees at all. The logical conclusion is that the Legislature did not intend these sections to apply to fees in addition to assessments. If the Legislature believed the assessment balloting procedure was sufficient for the conduct of an article XIII D, section 6(c) fee election, we would have expected the Act to say so.
Moreover, Elections Code section 4000 draws a distinction between "election[s]" and "assessment ballot proceeding[s]" conducted under Proposition 218. (Elec. Code, § 4000, subd. (c)(8), italics added.) It provides that an *1482 "election or assessment ballot proceeding required or authorized by Article XIIIC or XIIID of the California Constitution" may be conducted by mail. (Ibid.) The quoted phrasing is significant for two reasons. First, it confirms that the Legislature intended the ballot proceeding described in section 53753 to apply only to assessments.[16] In case there were any doubt about this intent, the amendment further provides: "when an assessment ballot proceeding is conducted by mail pursuant to this section, the following rules apply: [¶] (A) The proceeding shall be denominated an `assessment ballot proceeding' rather than an election. [¶] (B) Ballots shall be denominated `assessment ballots.'" (Elec. Code, § 4000, subd. (c)(8), italics added.)
Second, the phrasing of Elections Code section 4000, subdivision (c)(8) acknowledges two types of procedures that are required or authorized under Proposition 218 and might be conducted via a mailed ballot: elections and assessment ballot proceedings. It emphasizes the fact that those procedures are different because it imposes requirements on an "assessment ballot proceeding" that do not apply to an "election." Moreover, the very purpose of those additional requirements appears to expressly distinguish an "assessment ballot proceeding" from an election to voters. A subdivision of Government Code section 53753 likewise distinguishes an assessment ballot proceeding (there denominated a majority protest proceeding) from an election: "The majority protest proceedings described in this subdivision [i.e., the tabulation of the ballots] shall not constitute an election or voting for purposes of Article II of the California Constitution or of the California Elections Code." (Gov. Code, § 53753, subd. (e)(4).)
Both at the time the Act was first passed and at the time of the District fee election at issue, the only voter approved procedure discussed in the Act relating to Proposition 218 real property fees was an "election." (Elec. Code, § 4000, subd. (c)(8).) In sum, the conduct of an article XIII D, section 6(c) fee election is not addressed in the Act, other than to provide that it may be conducted by mail. (Elec. Code, § 4000, subd. (c)(8).)

*1483 F. Legal Principles Compel Our Conclusion the Secret Ballot is Part of a Fee Election

The plain language of Proposition 218 requires an "election" and voting for approval of new or increased property-related fees (with exceptions not relevant here). (Art. XIII D, § 6(c).) "Election" is used in other parts of Proposition 218 and its predecessor Proposition 13 to refer to voting by the general electorate that inferentially is conducted by secret ballot. A secret ballot election is also the meaning of "election" that is most familiar to the voters who passed the initiative.
In an important qualifying statement, article XIII D, section 6(c) permits agencies to use "procedures similar to those for increases in assessments in the conduct of elections under this subdivision." "[P]rocedures . . . for increases in assessments" (ibid.) refers to the assessment procedures in article XIII D, section 4, subdivisions (c) to (e), and those procedures do not clearly require or permit nonsecret balloting. Section 6(c) authorizes procedures "similar to," not "the same as," those in section 4 and it authorizes such procedures not only for property owner fee elections but also for general electorate fee elections. We determine this language permits the use of procedures such as mail balloting and vote weighting that are not inconsistent with the "election" requirement of section 6(c), and not to authorize nonsecret voting.
A coequal provision of the constitution, article II, section 7 provides, "Voting shall be secret," and is most reasonably harmonized with article XIII D, section 6(c) by construing "election" in article XIII D, section 6(c) to require secret voting. The initiative itself directs us to construe the statute liberally to further its purposes, which include enhancing taxpayer consent and restricting government's ability to extract revenue from property owners. These interpretive aids support a construction of section 6(c) to require secret voting. The ballot materials also support that interpretation. They emphasized the fact that the initiative implicated voting rights and qualified the ordinary understanding of those rights only by explaining that voting in some circumstances could be limited to property owners and weighted by the burden of an exaction on those property owners. No mention was made of a nonsecret ballot. Finally, the implementing legislation for Proposition 218 does not authorize the use of nonsecret voting in an article XIII D, section 6(c) fee election.
(12) Having considered the plain language of the initiative, a coequal provision of the California Constitution, and extrinsic aids to our interpretation of the constitutional provisions, we conclude the voters who approved Proposition 218 intended the voting in an article XIII D, section 6(c) fee election to be secret.

*1484 III. Greene's Election Contest

Greene contested the election results on the ground that "eligible voters who attempted to vote in accordance with the laws of the state were denied their right to vote." (Elec. Code, § 16100, subd. (e).) He asked for a recount and an order annulling and setting aside the election results. (Elec. Code, §§ 16500, 16601, 16603.)
(13) "`It is a primary principle of law as applied to election contests that it is the duty of the court to validate the election if possible. That is to say, the election must be held valid unless plainly illegal. [Citations.] . . .' . . . The contestant has the burden of proving the defect in the election by clear and convincing evidence. [Citations.]" (Wilks v. Mouton, supra, 42 Cal.3d at p. 404.) On the other hand, "`preservation of the integrity of the election process is far more important in the long run than the resolution of any one particular election.' [Citation.]" (Gooch, supra, 5 Cal.4th at p. 278.) "`[T]o uphold an election in the face of illegalities which affected the result [creates] a situation in which the will of the people may be thwarted by upholding an election.' [Citation.]" (Ibid.) "[A] court must not `sacrifice the integrity of the [elective] process on the altar of electoral finality.' [Citation.]" (Id. at p. 282.)
Greene initially framed his election contest claim as a challenge to the signature requirement on the ballot. He speculated that voters who did not sign their ballots did so in order to preserve the secrecy of the ballot. However, even without a signature the ballots were printed with the address of the parcel and name and address of the record owner of the parcel. Greene does not explain why a voter who wanted to vote secretly would submit such a ballot, signed or unsigned. Greene clarified at oral argument, and his appellate briefs, and the record of the trial court proceedings confirm, that his central legal argument in this litigation has always been that article II, section 7's secret voting requirement applies to an article XIII D, section 6(c) fee election. We have concluded this argument is correct.
(14) The District argues that a lack of secrecy in the election is not a ground for setting aside the election results pursuant to Elections Code section 16100, subdivision (e), which was the basis for Greene's election contest. However, "[t]he power of the court to invalidate a ballot measure on constitutional grounds is an exception to [the statutory] limitation on election contest proceedings." (Friends of Sierra Madre v. City of Sierra Madre (2001) 25 Cal.4th 165, 192 & fn. 17 [105 Cal.Rptr.2d 214, 19 P.3d 567]; see Canales v. City of Alviso (1970) 3 Cal.3d 118, 131 [89 Cal.Rptr. 601, 474 P.2d 417] (Canales).) The grounds for invalidating an election that are enumerated in Elections Code section 16100 must be construed to include violations of *1485 citizens' constitutional secret voting rights "if the judiciary is to remain available for the vindication of the fundamental rights at stake." (Canales, at p. 131.)
Because the trial court held that secret voting was not required under article XIII D, section 6(c), it never reached the factual issue of whether the election as conducted by the District preserved secrecy in voting. We note that the District's Election Procedures provided that only designated persons would have access to the ballots, required the ballots to remain under seal until tabulation, and expressly barred the disclosure of any individual's vote absent a court order. These procedures, if followed, might have been sufficient to preserve the secrecy of the voting. However, insofar as the record indicates, voters were not provided any assurances that their votes would remain confidential both before and after tabulation of the ballots. Although the Election Procedures were public documents, they were not mailed to voters and the materials provided to voters to describe the election procedures (and included in the record) did not assure them of voting secrecy.[17] Voters who are required to cast their votes on ballots that disclose their names and identify the property they own and that must be signed to be counted, and who are not provided assurances that their votes will be kept permanently confidential, may reasonably be said to have been "denied their right to vote" (Elec. Code, § 16100, subd. (e)) as that right is protected by article II, section 7. That is, they have been denied their right to vote freely with the confidence that their votes will remain secret before and after tabulation of the ballots.
"An election shall not be set aside on account of eligible voters being denied the right to vote, unless it appears that a sufficient number of voters were denied the right to vote as to change the result." (Elec. Code, §§ 16204, 16402.5 [identical statutes].) In Gooch, the Supreme Court construed similar language and concluded, "In utilizing the phrase `it appears,' we think the Legislature contemplated circumstances, such as those at hand, in which illegal votes cannot be attributed to any one candidate, but nevertheless `appear' sufficient in number or effect to have altered the outcome of the election." (Gooch, supra, 5 Cal.4th at pp. 282-283 [construing Elec. Code, former § 20024].)[18] In Gooch, the court concluded that 930 illegal ballots had *1486 been cast in five school board races and as to each race the illegal ballots could have affected the outcome of the election. (5 Cal.4th at pp. 270, 276.) Because the illegal ballots had been mixed in with the legal ballots, however, it was impossible to identify them and determine if those specific ballots had actually changed the results of the election. (Id. at p. 276.) The court nevertheless concluded that in light of "widespread illegal voting practices that permeated th[e] election" on behalf of the winning candidates, the election results should be set aside. (Id. at p. 285; see also id. at p. 282; Canales, supra, 3 Cal.3d at pp. 126-128 [relying on circumstantial evidence that illegalities affected outcome to set aside an election].)
(15) Here, the lack of secrecy in the District's fee election was a widespread violation of a constitutional safeguard of free elections. Although the record does not demonstrate that particular votes were affected by the lack of secrecy in a manner that changed the outcome, such a showing is unnecessary under Gooch. (Gooch, supra, 5 Cal.4th at p. 282.) Our conclusion is consistent with a long line of cases recognizing that violations of mandatory provisions of election laws vitiate an election, and even violations of merely directory provisions vitiate an election where it can be shown that the violation affected the outcome or "injuriously affected" the "rights of the voters" or where the violation was so severe as to allow unfairness to be presumed. (Rideout v. City of Los Angeles (1921) 185 Cal. 426, 430, 432 [197 P. 74]; Tebbe v. Smith (1895) 108 Cal. 101, 111-112 [41 P. 454]; Atkinson v. Lorbeer (1896) 111 Cal. 419, 422 [44 P. 162]; see Gooch, at p. 278, fn. 7 [explaining that Rideout principle has been incorporated into Elections Code as to statutory violations].) The constitutional violation at issue here is analogous to a mandatory statutory requirement (see Atkinson, at p. 422 [Australian ballot system is in many respects mandatory]; Burson, supra, 504 U.S. at pp. 202-203 [explaining Australian system was designed to secure secrecy in voting]), and it deprived every voter of his or her right to vote freely with the knowledge that his or her vote would remain confidential.
(16) We set aside the District's fee election because the voters were instructed to cast signed ballots with their names and addresses printed on the face of the ballots and were given no assurances that the ballot would be kept *1487 confidential. The votes cast were not a reliable expression of the popular will. (See Canales, supra, 3 Cal.3d at p. 127; Gooch, supra, 5 Cal.4th at p. 284.)[19]

DISPOSITION
We reverse the judgment and direct the trial court to enter judgment for Greene and to set aside and annul the July 25, 2007 election on whether to approve a storm drainage fee for zone 9 of the Marin County Flood Control and Water Conservation District. The District shall pay Greene's costs.
Jones, P. J., and Needham, J., concurred.
NOTES
[*] Judge of the Superior Court of San Francisco City and County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.
[1] California Constitution, article XIII D, section 6, subdivision (c) states: "Voter Approval for New or Increased Fees and Charges. Except for fees or charges for sewer, water, and refuse collection services, no property related fee or charge shall be imposed or increased unless and until that fee or charge is submitted and approved by a majority vote of the property owners of the property subject to the fee or charge or, at the option of the agency, by a two-thirds vote of the electorate residing in the affected area. The election shall be conducted not less than 45 days after the public hearing. An agency may adopt procedures similar to those for increases in assessments in the conduct of elections under this subdivision."
[2] Proposition 13, which was adopted by voters on June 6, 1978, added article XIII A to the California Constitution. (Knox v. City of Orland (1992) 4 Cal.4th 132, 140 [14 Cal.Rptr.2d 159, 841 P.2d 144] (Knox).)
[3] All article references are to articles of the California Constitution.
[4] A property assessment is a levy or charge on real property for a special benefit that is conferred upon the real property. (Art. XIII D, § 2, subd. (b); Knox, supra, 4 Cal.4th at pp. 141-142 ["a special assessment is `levied against real property particularly and directly benefited by a local improvement in order to pay the cost of that improvement'"].)
[5] Ford Greene's request for judicial notice of the legislative history of the act, filed May 20, 2008, is granted.
[6] "Fee" and "charge" appear to be synonymous in article XIII D. (Bighorn-Desert View Water Agency v. Verjil (2006) 39 Cal.4th 205, 214, fn. 4 [46 Cal.Rptr.3d 73, 138 P.3d 220] (Bighorn).) Hereafter, we use the term "fee" to refer to both.
[7] Interveners' request for judicial notice, filed June 17, 2008, is denied. The submitted newspaper articles about the 2005 flood and about this lawsuit are not proper matters for judicial notice and are not relevant to the legal issues we must decide in this appeal. (Mangini v. R. J. Reynolds Tobacco Co. (1994) 7 Cal.4th 1057, 1064, 1065 [31 Cal.Rptr.2d 358, 875 P.2d 73] (Mangini) [truth of the contents of a newspaper article is not judicially noticeable], overruled on other grounds in In re Tobacco Cases II (2007) 41 Cal.4th 1257, 1262 [63 Cal.Rptr.3d 418, 163 P.3d 106]; Mangini, at p. 1063 [only relevant material is a proper subject of judicial notice]; Evid. Code, §§ 450-452, 459.)
[8] In his verified complaint, Greene alleges that a recount took place and resulted in a determination the fee would have been rejected if the unsigned ballots were counted. This is disputed by the District and Interveners.
[9] Article XIII D, section 4, subdivision (g) provides: "Because only special benefits are assessable, electors residing within the district who do not own property within the district shall not be deemed under this Constitution to have been deprived of the right to vote for any assessment. If a court determines that the Constitution of the United States or other federal law requires otherwise, the assessment shall not be imposed unless approved by a two-thirds vote of the electorate in the district in addition to being approved by the property owners as required by subdivision (e)." (Italics added.) This provision tends to demonstrate that voters did not intend assessment balloting under article XIII D, section 4 to be a "vote" within the ordinary or constitutional meaning of the term, absent a federal legal ruling to the contrary.
[10] Greene argues that the use of the word "may" in this passage means that the property owner has the choice whether or not to identify him or herself on the ballot. This is not a reasonable construction of the passage. "May indicate" applies not only to the voter's name, but also the identity of the parcel and the property owner's vote. Those pieces of information are essential to counting (and weighting) the property owner's vote. Therefore, the use of "may" in the passage has no more significance than if the passage stated that the agency must provide a ballot whereby the property owner may vote. To the extent it implies voluntariness, it is the choice whether to vote at all. If the property owner wants to cast a vote, he or she must provide the listed information.
[11] The persons designated to conduct the election (the Clerk) were directed to "date stamp the return envelopes of the unopened ballots [upon receipt] and deposit the unopened, date-stamped envelopes into a secure container (the `Lock Box') to be kept in the office of the Clerk for such purpose. The Clerk shall keep the ballots in the Lock Box until the commencement of canvassing the ballots . . . . [¶] Only the Clerk and the Clerk's deputies shall have access to the Lock Box and to the ballots in the Lock Box. . . . No ballot shall be removed from its return envelope prior to the time specified for commencement of canvassing ballots. [¶] . . . [¶] During and after the canvass of ballots, neither the Clerk nor any person deputized by the Clerk . . . shall disclose the contents of any individual ballot that identifies how a voter voted to any person or entity, including any member of the Board, District staff or any member of the public, unless ordered to do so by a court of competent jurisdiction. [¶] No report, in written, electronic or other form, shall be produced, nor shall any record (other than the ballots themselves) be maintained in such a manner that would disclose how any voter voted."
[12] We need not and do not decide whether secret voting is required in assessment balloting under article XIII D, section 4.
[13] Neither was the voting or taxpayer approval process subject to the one-person, one-vote principle of the federal and state equal protection clauses. That principle is inapplicable to an election to form a limited purpose assessment district that will have a disproportionate effect on property owners. (Salyer Land Co. v. Tulare Water District (1973) 410 U.S. 719, 728 [35 L.Ed.2d 659, 93 S.Ct. 1224]; Southern Cal. Rapid Transit Dist. v. Bolen (1992) 1 Cal.4th 654, 665 [3 Cal.Rptr.2d 843, 822 P.2d 875].) Voting on such assessments may be restricted to property owners and weighted according to the value of the voter's property without violating the constitution. (Salyer, at p. 728, 733-734; Bolen, at p. 659.)
[14] Again, the issue of whether assessment balloting under article XIII D, section 4 may be conducted without secret voting is not before us.
[15] The Legislature, of course, has no power to legislate in conflict with a constitutional provision where the meaning of that provision is clear. (Silicon Valley, supra, 44 Cal.4th at p. 448.)
[16] Despite some variation in the language of the Act, it is clear that "assessment ballot proceeding" is a reference to the procedures set forth in Government Code section 53753. Section 53753 never uses the full phrase "assessment ballot proceeding," but it frequently refers to "assessment ballots." (See Gov. Code, § 53753, subd. (b) ["procedures for the completion, return, and tabulation of the assessment ballots"]; id., subds. (c), (e)(1), (2) [numerous references to "assessment ballot" or "assessment ballots"].) There are a few references to "majority protests" (Gov. Code, § 53753, subds. (c), (e)(2), (3)), and the tabulation part of the procedures are referred to as "majority protest proceedings" (id., subd. (e)(4)). However, there is nothing else in the Act that could constitute "assessment ballot proceeding[s] required or authorized by Article [XIII C] or [XIII D] of the California Constitution." (Elec. Code, § 4000, subd. (c)(8).) Because this was the only legislation enacted to implement Proposition 218 at the time "assessment ballot proceeding" was added to Elections Code section 4000, subdivision (c)(8), we can also reasonably assume the phrase is not a reference to some other statutory assessment ballot proceeding.
[17] On December 15, 2008, the District asked us to take judicial notice of a "Ballot Notice" that its Director avers was sent to all voters in the fee election along with the ballots. Greene avers that he did not receive the notice with his ballot and he questions the authenticity of the notice. Because the facts of which the District wants us to take judicial noticethat the District published the notice and mailed it to voters with their ballotsare disputed, they are not proper subjects of judicial notice. The request is denied.
[18] Elections Code former section 20024 was identical to current Elections Code section 16203, which provides: "An election shall not be set aside on account of illegal votes, unless it appears that a number of illegal votes has been given to the person whose right to the office is contested or who has been certified as having tied for first place, which, if taken from him, would reduce the number of his legal votes below the number of votes given to some other person for the same office, after deducting therefrom the illegal votes which may be shown to have been given to that other person." (See Gooch, supra, 5 Cal.4th at p. 282 [quoting Elec. Code, former § 20024]; see Stats. 1961, ch. 23, p. 582.)
[19] Because we set aside the election on the ground that it violated article II, section 7, we need not address Greene's arguments that voters were not given adequate notice of the signature requirement and that the failure to count unsigned ballots violated equal protection principles.